ENGLAND ET AL. *v.* LOUISIANA STATE BOARD
OF MEDICAL EXAMINERS ET AL.

No. 7.   Argued October 15, 1963.—Decided January 13, 1964.

*Russell Morton Brown* argued the cause for appellants. With him on the brief was *J. Minos Simon.*

*Robert E. LeCorgne, Jr.* argued the cause for appellees. With him on the brief were *St. Clair Adams, Jr.* and *Ashton Phelps.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Appellants are graduates of schools of chiropractic who seek to practice in Louisiana without complying with the educational requirements of the Louisiana Medical Practice Act, Title 37, La. Rev. Stat. §§ 1261–1290. They brought this action against respondent Louisiana State Board of Medical Examiners in the Federal District Court

for the Eastern District of Louisiana, seeking an injunction and a declaration that, as applied to them, the Act violated the Fourteenth Amendment. A statutory three-judge court [1] invoked, *sua sponte,* the doctrine of abstention, on the ground that "The state court might effectively end this controversy by a determination that chiropractors are not governed by the statute," and entered an order "staying further proceedings in this Court until the courts of the State of Louisiana shall have been afforded an opportunity to determine the issues here presented, and retaining jurisdiction to take such steps as may be necessary for the just disposition of the litigation should anything prevent a prompt state court determination." 180 F. Supp. 121, 124.[2]

Appellants thereupon brought proceedings in the Louisiana courts. They did not restrict those proceedings to the question whether the Medical Practice Act applied to chiropractors. They unreservedly submitted for decision, and briefed and argued, their contention that the Act, if applicable to chiropractors, violated the Fourteenth Amendment.[3] The state proceedings terminated with a

---

[1] The action was brought in 1957. The District Court initially dismissed the complaint on the authority of *Louisiana State Board of Medical Examiners* v. *Fife,* 162 La. 681, 111 So. 58, aff'd *per curiam,* 274 U. S. 720. The Court of Appeals for the Fifth Circuit reversed, 259 F. 2d 626, on petition for rehearing, 263 F. 2d 661. We denied certiorari, 359 U. S. 1012. On remand the three-judge District Court was convened.

[2] Appellants did not challenge the order of abstention by appeal here. See *Turner* v. *City of Memphis,* 369 U. S. 350; 28 U. S. C. § 1253. Nor do they now challenge it. Thus there is not before us any question as to either the proper scope of the abstention doctrine or the propriety of its application to this case.

[3] Appellants' petition in the Louisiana trial court appended a copy of the abstention order and opinion and recited that the state proceeding was brought "in pursuance of and obedience to" the abstention order. Like the complaint filed in the federal court, the petition

decision by the Louisiana Supreme Court declining to review an intermediate appellate court's holding both that the Medical Practice Act applied to chiropractors and that, as so applied, it did not violate the Fourteenth Amendment. 126 So. 2d 51.

Appellants then returned to the District Court,[4] where they were met with a motion by appellees to dismiss the federal action. This motion was granted, on the ground that "since the courts of Louisiana have passed on all issues raised, including the claims of deprivation under the Federal Constitution, this court, having no power to review those proceedings, must dismiss the complaint. The proper remedy was by appeal to the Supreme Court of the United States." The court saw the case as illustrating "the dilemma of a litigant who has invoked the jurisdiction of a federal court to assert a claimed constitutional right and finds himself remitted to the state tribunals." The dilemma, said the court, was that "On the one hand, in view of Government & Civic Employees Organizing Committee v. Windsor, 353 U. S. 364, . . . he dare not restrict his state court case to local law issues. On the other, if, as required by Windsor, he raises the federal questions there, well established principles will

sought both declaratory and injunctive relief. The allegations were that the Medical Practice Act was inapplicable to chiropractors and also "In the alternative, in the event the court should hold that the Medical Practice Act does apply to your plaintiffs . . . said Act is unconstitutional" because in violation of the Fourteenth Amendment. The petition challenged the statute's validity under that Amendment in terms substantially identical to those in the federal court complaint. The trial court, on the basis of the same documentary evidence that had been submitted to the three-judge District Court, sustained appellees' defense of "no cause of action."

[4] Appellants made no attempt to obtain appellate review of the state court decision in this Court. See *Lassiter* v. *Northampton County Board of Elections*, 360 U. S. 45; *NAACP* v. *Button*, 371 U. S. 415; 28 U. S. C. § 1257 (2).

bar a relitigation of those issues in the United States District Court. . . . Since, in the usual case, no question not already passed on by the state courts will remain, he is thereby effectively deprived of a federal forum for the adjudication of his federal claims." 194 F. Supp. 521, 522. Appellants appealed directly to this Court under 28 U. S. C. § 1253, and we noted probable jurisdiction. 372 U. S. 904. We reverse and remand to the District Court for decision on the merits of appellants' Fourteenth Amendment claims.

There are fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims.[5] Such a result would be at war with the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred specific categories of jurisdiction upon the federal courts, and with the principle that "When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction . . . . The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied." *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19, 40. Nor does anything in the abstention doctrine require or support such a result. Abstention is a judge-fashioned vehicle for according appropriate deference to the "respective competence of the state and federal court systems." *Louisiana P. & L. Co.* v. *Thibodaux,* 360 U. S. 25, 29. Its recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of

---

[5] At least this is true in a case, like the instant one, not involving the possibility of unwarranted disruption of a state administrative process. Compare *Burford* v. *Sun Oil Co.,* 319 U. S. 315; *Alabama Public Service Comm'n* v. *Southern R. Co.,* 341 U. S. 341.

the federal judiciary in deciding questions of federal law.[6] Accordingly, we have on several occasions explicitly recognized that abstention "does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise." *Harrison* v. *NAACP*, 360 U. S. 167, 177; *accord, Louisiana P. & L. Co.* v. *Thibodaux, supra,* 360 U. S., at 29.[7]

It is true that, after a post-abstention determination and rejection of his federal claims by the state courts, a litigant could seek direct review in this Court. *NAACP* v. *Button*, 371 U. S. 415; *Lassiter* v. *Northampton County Board of Elections*, 360 U. S. 45. But such review, even when available by appeal rather than only by discretionary writ of certiorari, is an inadequate substitute for the initial District Court determination—often by three judges, 28 U. S. C. § 2281—to which the litigant is entitled in the federal courts. This is true as to issues of law; it is especially true as to issues of fact. Limiting the litigant to review here would deny him the benefit of a federal trial court's role in constructing a record and making fact findings. How the facts are found will often dictate the decision of federal claims. "It is the typical,

---

[6] See Kurland, Toward a Co-operative Judicial Federalism: The Federal Court Abstention Doctrine, 24 F. R. D. 481, 487.

[7] The doctrine contemplates only "that controversies involving unsettled questions of state law [may] be decided in the state tribunals preliminary to a federal court's consideration of the underlying federal constitutional questions," *City of Meridian* v. *Southern Bell Tel. & Tel. Co.*, 358 U. S. 639, 640; "that decision of the federal question be deferred until the potentially controlling state-law issue is authoritatively put to rest," *United Gas Pipe Line Co.* v. *Ideal Cement Co.*, 369 U. S. 134, 135–136; "that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law," *Spector Motor Service, Inc.*, v. *McLaughlin*, 323 U. S. 101, 105; "that these enactments should be exposed to state construction or limiting interpretation before the federal courts are asked to decide upon their constitutionality," *Harrison* v. *NAACP*, 360 U. S. 167, 178.

not the rare, case in which constitutional claims turn upon the resolution of contested factual issues." *Townsend* v. *Sain,* 372 U. S. 293, 312. "There is always in litigation a margin of error, representing error in factfinding . . . ." *Speiser* v. *Randall,* 357 U. S. 513, 525. Thus in cases where, but for the application of the abstention doctrine, the primary fact determination would have been by the District Court, a litigant may not be unwillingly deprived of that determination.[8] The possibility of appellate review by this Court of a state court determination may not be substituted, against a party's wishes, for his right to litigate his federal claims fully in the federal courts. We made this clear only last Term in *NAACP* v. *Button, supra,* 371 U. S., at 427, when we said that "a party has the right to return to the District Court, after obtaining the authoritative state court construction for which the court abstained, for a final determination of his claim."

We also made clear in *Button,* however, that a party may elect to forgo that right. Our holding in that case was that a judgment of the Virginia Supreme Court of Appeals upon federal issues submitted to the state tribunals by parties remitted there under the abstention doctrine was "final" for purposes of our review under 28 U. S. C. § 1257. In so determining, we held that the petitioner had elected "to seek a complete and final adjudication of [its] rights in the state courts" and thus not to return to the District Court, and that it had manifested this election "by seeking from the Richmond Circuit Court 'a binding adjudication' of all its claims and a per-

---

[8] Even where fact findings on federal constitutional contentions are for state tribunals to make in the first instance, as in state criminal prosecutions, they are not immune, when brought into question in federal habeas corpus, from District Court consideration and, in proper cases, from *de novo* consideration. *Townsend* v. *Sain,* 372 U. S. 293, 312–319.

manent injunction as well as declaratory relief, by making no reservation to the disposition of the entire case by the state courts, and by coming here directly on certiorari." 371 U. S., at 427–428. We fashioned the rule recognizing such an election because we saw no inconsistency with the abstention doctrine in allowing a litigant to decide, once the federal court has abstained and compelled him to proceed in the state courts in any event, to abandon his original choice of a federal forum and submit his entire case to the state courts, relying on the opportunity to come here directly if the state decision on his federal claims should go against him. Such a choice by a litigant serves to avoid much of the delay and expense to which application of the abstention doctrine inevitably gives rise; when the choice is voluntarily made, we see no reason why it should not be given effect.

In *Button,* we had no need to determine what steps, if any, short of those taken by the petitioner there would suffice to manifest the election. The instant case, where appellants did not attempt to come directly to this Court but sought to return to the District Court, requires such a determination. The line drawn should be bright and clear, so that litigants shunted from federal to state courts by application of the abstention doctrine will not be exposed, not only to unusual expense and delay, but also to procedural traps operating to deprive them of their right to a District Court determination of their federal claims.[9] It might be argued that nothing short of what was done in *Button* should suffice—that a litigant should retain the right to return to the District Court unless he not only litigates his federal claims in the state tribunals but seeks review of the state decision in this Court.[10] But

---

[9] Cf. Wright, The Abstention Doctrine Reconsidered, 37 Tex. L. Rev. 815, 825 (1959).

[10] One case has even permitted the litigant to return to the District Court although review was sought and denied here. See *Tribune*

we see no reason why a party, after unreservedly litigating his federal claims in the state courts although not required to do so, should be allowed to ignore the adverse state decision and start all over again in the District Court. Such a rule would not only countenance an unnecessary increase in the length and cost of the litigation; it would also be a potential source of friction between the state and federal judiciaries. We implicitly rejected such a rule in *Button,* when we stated that a party elects to forgo his right to return to the District Court by a decision "to seek a complete and final adjudication of his rights in the state courts." We now explicitly hold that if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then—whether or not he seeks direct review of the state decision in this Court—he has elected to forgo his right to return to the District Court.

This rule requires clarification of our decision in *Government Employees* v. *Windsor,* 353 U. S. 364, the case referred to by the District Court. The plaintiffs in *Windsor* had submitted to the state courts only the question whether the state statute they challenged applied to them, and had not "advanced" or "presented" to those courts their contentions against the statute's constitutionality. We held that "the bare adjudication by the Alabama Supreme Court that the [appellant] union is subject to this Act does not suffice, since that court was not asked to interpret the statute in light of the constitutional objections presented to the District Court. If appellants'

*Review Publishing Co.* v. *Thomas,* 153 F. Supp. 486, aff'd, 254 F. 2d 883, where the litigant's federal claims were decided by the District Court following decision upon the same claims by the Pennsylvania Supreme Court and denial by us of certiorari to that court's judgment. *Mack* v. *Pennsylvania,* 386 Pa. 251, 126 A. 2d 679, cert. denied, 352 U. S. 1002.

freedom-of-expression and equal-protection arguments had been presented to the state court, it might have construed the statute in a different manner." 353 U. S., at 366. On oral argument in the instant case, we were advised that appellants' submission of their federal claims to the state courts had been motivated primarily by a belief that *Windsor* required this. The District Court likewise thought that under *Windsor* a party is required to litigate his federal question in the state courts and "dare not restrict his state court case to local law issues." 194 F. Supp., at 522. Others have read *Windsor* the same way.[11] It should not be so read. The case does not mean that a party must litigate his federal claims in the state courts, but only that he must inform those courts what his federal claims are, so that the state statute may be construed "in light of" those claims. See Note, 73 Harv. L. Rev. 1358, 1364–1365 (1960). Thus mere compliance with *Windsor* will not support a conclusion, much less create a presumption, that a litigant has freely and without reservation litigated his federal claims in the state courts and so elected not to return to the District Court.

We recognize that in the heat of litigation a party may find it difficult to avoid doing more than is required by *Windsor*. This would be particularly true in the typical case, such as the instant one, where the state courts are asked to construe a state statute against the backdrop of a federal constitutional challenge. The litigant denying the statute's applicability may be led not merely to state his federal constitutional claim but to argue it, for if he can persuade the state court that application of the statute to him would offend the Federal Constitution, he will ordinarily have persuaded it

---

[11] See Note, 59 Col. L. Rev. 749, 773 (1959); Note, 73 Harv. L. Rev. 1358, 1364 (1960), quoting brief for appellant, p. 5, in *Lassiter* v. *Northampton County Board of Elections*, 360 U. S. 45.

that the statute should not be construed as applicable to him. In addition, the parties cannot prevent the state court from rendering a decision on the federal question if it chooses to do so; and even if such a decision is not explicit, a holding that the statute is applicable may arguably imply, in view of the constitutional objections to such a construction, that the court considers the constitutional challenge to be without merit.

Despite these uncertainties arising from application of *Windsor*—which decision, we repeat, does not require that federal claims be actually litigated in the state courts—a party may readily forestall any conclusion that he has elected not to return to the District Court. He may accomplish this by making on the state record the "reservation to the disposition of the entire case by the state courts" that we referred to in *Button*. That is, he may inform the state courts that he is exposing his federal claims there only for the purpose of complying with *Windsor*, and that he intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions. Such an explicit reservation is not indispensable; the litigant is in no event to be denied his right to return to the District Court unless it clearly appears that he voluntarily did more than *Windsor* required and fully litigated his federal claims in the state courts.[12] When the reserva-

---

[12] It has been suggested that state courts may "take no more pleasure than do federal courts in deciding cases piecemeal . . ." and "probably prefer to determine their questions of law with complete records of cases in which they can enter final judgments before them." *Clay* v. *Sun Ins. Office*, 363 U. S. 207, 227 (dissenting opinion). We are confident that state courts, sharing the abstention doctrine's purpose of "furthering the harmonious relation between state and federal authority," *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496, 501, will respect a litigant's reservation of his federal claims for decision by the federal courts. See *Spector Motor Service, Inc.*, v. *Walsh*,

tion has been made, however, his right to return will in all events be preserved.[13]

On the record in the instant case, the rule we announce today would call for affirmance of the District Court's judgment. But we are unwilling to apply the rule against these appellants. As we have noted, their primary reason for litigating their federal claims in the state courts was assertedly a view that *Windsor* required them to do so.[14] That view was mistaken, and will not avail other litigants who rely upon it after today's decision. But we cannot say, in the face of the support given the view by respectable authorities, including the court below, that appellants were unreasonable in holding it or acting upon it. We therefore hold that the District Court should not have

135 Conn. 37, 40–41, 61 A. 2d 89, 92. However, evidence that a party has been compelled by the state courts to litigate his federal claims there will of course preclude a finding that he has voluntarily done so. And if the state court has declined to decide the state question because of the litigant's refusal to submit without reservation the federal question as well, the District Court will have no alternative but to vacate its order of abstention.

[13] The reservation may be made by any party to the litigation. Usually the plaintiff will have made the original choice to litigate in the federal court, but the defendant also, by virtue of the removal jurisdiction, 28 U. S. C. § 1441 (b), has a right to litigate the federal question there. Once issue has been joined in the federal court, no party is entitled to insist, over another's objection, upon a binding state court determination of the federal question. Thus, while a plaintiff who unreservedly litigates his federal claims in the state courts may thereby elect to forgo his own right to return to the District Court, he cannot impair the corresponding right of the defendant. The latter may protect his right by either declining to oppose the plaintiff's federal claim in the state court or opposing it with the appropriate reservation. It may well be, of course, that a refusal to litigate or a reservation by any party will deter the state court from deciding the federal question.

[14] The District Court's abstention order, in instructing appellants to obtain a state court determination not of the state question alone but of "the issues here presented," was also misleading.

dismissed their action. The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, concurring.

The judge-made rule we announce today promises to have such a serious impact on litigants who are properly in the federal courts that I think a reappraisal of *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496, from which today's decision stems, is necessary. Although the propriety of the *Pullman* doctrine, either as originally decided or as it has evolved, has not been raised by the parties, I think it is time for the Court, *sua sponte,* to reevaluate it.

## I.

The *Pullman* case, decided a little over 20 years ago, launched an experiment in the management of federal-state relations that has inappropriately been called the "abstention doctrine." There are numerous occasions when a federal court abstains, dismissing an action or declining to entertain it because a state tribunal is a more appropriate one for resolving the controversy. A bankruptcy court commonly sends its trustee into state courts to have complex questions of local law adjudicated. *Thompson* v. *Magnolia Co.,* 309 U. S. 478. A federal court refuses to exercise its equity powers by appointing receivers to take charge of a failing business, where state procedures afford adequate protection to all private rights. *Pennsylvania* v. *Williams,* 294 U. S. 176. A federal court will normally not entertain a suit to enjoin criminal prosecutions in state tribunals, with review of such convictions by this Court being restricted to constitutional issues. *Beal* v. *Missouri Pac. R. Co.,* 312 U. S. 45. A federal court declines to entertain an action for declaratory relief against state taxes because of the federal policy against

interfering with them by injunction. *Great Lakes Co.* v. *Huffman,* 319 U. S. 293. Where state administrative action is challenged, a federal court will normally not intervene where there is an adequate state court review which is protective of any federal constitutional claim. *Burford* v. *Sun Oil Co.,* 319 U. S. 315; *Alabama Comm'n* v. *Southern R. Co.,* 341 U. S. 341. The examples could be multiplied where the federal court adopts a hands-off policy and remits the litigants to a state tribunal.

*Railroad Comm'n* v. *Pullman Co., supra,* is a different kind of case. There the federal court does not abstain; it does not dismiss the complaint; it retains jurisdiction while the parties go to a state tribunal to obtain a preliminary ruling—a declaratory judgment—on state law questions. The reason for requiring them to repair to the state tribunal for a preliminary ruling on a question of state law is because the state law is challenged on federal constitutional grounds; if the state law is construed one way, the constitutional issue may disappear; the federal constitutional question will survive only if one of two or more state-law constructions is adopted. The "last word" as to the meaning of local law "belongs neither to us nor to the district court but to the supreme court of Texas," we said in the *Pullman* case, 312 U. S., at 500. We concluded:

> "In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. *Glenn* v. *Field Packing Co.,* 290 U. S. 177; *Lee* v. *Bickell,* 292 U. S. 415. The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication." *Ibid.*

We therefore remanded the case "with directions to retain the bill pending a determination of proceedings, to be brought with reasonable promptness, in the state court in conformity with this opinion." *Id.*, at 501–502.

## II.

I was a member of the Court that launched *Pullman* and sent it on its way. But if I had realized the creature it was to become, my doubts would have been far deeper than they were.

*Pullman* from the start seemed to have some qualities of a legal research luxury. As I said in *Clay* v. *Sun Ins. Office,* 363 U. S. 207, 228 (dissenting opinion):

> "Some litigants have long purses. Many, however, can hardly afford one lawsuit, let alone two. Shuttling the parties between state and federal tribunals is a sure way of defeating the ends of justice. The pursuit of justice is not an academic exercise. There are no foundations to finance the resolution of nice state law questions involved in federal court litigation. The parties are entitled—absent unique and rare situations—to adjudication of their rights in the tribunals which Congress has empowered to act."

As recently stated by the late Judge Charles E. Clark of the Second Circuit Court of Appeals, "As a result of this doctrine, individual litigants have been shuffled back and forth between state and federal courts, and cases have been dragged out over eight- and ten-year periods." Federal Procedural Reform and States' Rights, 40 Tex. L. Rev. 211, 221 (1961).

Professor Charles A. Wright described the results that occurred when this doctrine was applied to a suit to enjoin the enforcement of a state statute restricting the rights of state employees to join unions:[1] ". . . after

---

[1] *Government Employees* v. *Windsor,* 353 U. S. 364.

five years of litigation, including two trips to the Supreme Court of the United States and two to the highest state court, the parties still had failed to obtain a decision on the merits of the statute." The Abstention Doctrine Reconsidered, 37 Tex. L. Rev. 815, 818 (1959).

This case raises a question so simple that it at least verges on the insubstantial. The question is whether Louisiana's Medical Practice Act, La. Rev. Stat., § 37:1261 *et seq.* includes chiropractors as practitioners of medicine. The State Board of Medical Examiners, representing the State, says that they are included. The chiropractors say they are not and, if they are, that the Act is unconstitutional. The case was started in May 1957, and here we are nearly seven years later without a decision on the merits.

That seems like an unnecessary price to pay for our federalism. Referral to state courts for declaratory rulings on state law questions is said to encourage a smooth operation of our federalism, as it may avoid clashes between the two systems. But there always have been clashes and always will be; and the influence of the *Pullman* doctrine has, I think, been *de minimis.* Moreover, the complexity of local law to federal judges is inherent in the federal court system as designed by Congress. Resolution of local law questions is implicit in diversity of citizenship jurisdiction. Since *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, the federal courts under that head of jurisdiction daily have the task of determining what the state law is. The fact that those questions are complex and difficult is no excuse for a refusal by the District Court to entertain the suit. *Meredith* v. *Winter Haven,* 320 U. S. 228. We there said:

> "The diversity jurisdiction was not conferred for the benefit of the federal courts or to serve their convenience. Its purpose was generally to afford to

suitors an opportunity in such cases, at their option, to assert their rights in the federal rather than in the state courts." *Id.*, at 234. And see *Allegheny County* v. *Mashuda Co.*, 360 U. S. 185, 196.

The question now presented is how and when one who asserts his "option" to sue in "the federal rather than in the state courts," but who is remitted to the state court for a preliminary ruling, loses his right to return to the federal court for a final adjudication on the constitutional issues.

In *Propper* v. *Clark*, 337 U. S. 472, 491, we said that if, on referral of a discrete issue to the state courts, the latter required "complete adjudication of the controversy, the District Court would perhaps be compelled to stay proceedings in the state court to protect its own jurisdiction." We went on to say, "Otherwise, in sending a fragment of the litigation to a state court, the federal court might find itself blocked by *res judicata,* with the result that the entire federal controversy would be ousted from the federal courts, where it was placed by Congress." *Id.*, at 491–492.

Today we put federal jurisdiction in jeopardy. As the Court says there are many advantages in a federally constructed record. Moreover, federal judges appointed for life are more likely to enforce the constitutional rights of unpopular minorities than elected state judges. Madison stated the problem when the creation of lower federal courts was being mooted:

"What was to be done after improper verdicts, in state tribunals, obtained under the biased directions of a dependent judge, or the local prejudices of an undirected jury? To remand the cause for a new trial would answer no purpose. To order a new trial at the supreme bar would oblige the parties to bring up their witnesses, though ever so distant from the

seat of the court. An effective judiciary establishment, commensurate to the legislative authority, was essential. A government without a proper executive and judiciary would be the mere trunk of a body, without arms or legs to act or move." 5 Elliot's Debates (Lipp. ed. 1941), p. 159.

Federal judges have come in for a share of criticism in this regard, the charge at times being that on racial issues they have too often "suffered the federal law to be flouted." Lusky, Racial Discrimination and the Federal Law, 63 Col. L. Rev. 1163, 1179 (1963). That at times may be the case. But from this vantage point their devotion to the rule of law over-all seems outstanding. We stand to let federal courts lose their command over critical litigation by what we do today. The Court holds that, though the litigant goes to the state court involuntarily, he loses his right to return to the federal court if he submits the local law question and the constitutional questions to the state tribunal without reserving his right to return to the federal forum for a final adjudication. It will often be necessary to submit the local law question in light of the constitutional questions. Indeed it will be prudent to do so in light of *Government Employees* v. *Windsor, supra,* where we ruled, "The bare adjudication by the Alabama Supreme Court that the union is subject to this Act does not suffice, since that court was not asked to interpret the statute in light of the constitutional objections presented to the District Court." 353 U. S., at 366.

Yet we now hold that if a party, who is sent by the federal court to the state courts for a preliminary ruling, submits the whole problem to those courts—that is, the constitutional as well as the bare bones of the state law question—he is presumed to have elected to try his case there rather than in the federal courts, unless he expressly reserved the right to return to the federal tribunal.

Perhaps the Court does that to avoid the consequences of *res judicata*. But *res judicata* is not a constitutional principle; it has no higher dignity than the principle we announce today. In *Propper* v. *Clark, supra,* we said that to avoid *res judicata* the District Court should stay the state proceedings. Better that we approve that judge-made procedure than to overlay the treacherous requirement of the *Pullman* case with this new judge-made requirement.

What we do today makes the *Pullman* case something of a Frankenstein. Any presumption should work the other way—that he who is *required* to go to the state courts and does what we *require* him to do when he gets there, is not there voluntarily and does not forsake his federal suit, unless he does something in the state courts that he is not required to do and that evinces an election to litigate the matter finally and not preliminarily in the state courts.

As, if, and when he exhausts the state procedure and decides to come here, as was done in *NAACP* v. *Button,* 371 U. S. 415, he has elected to abandon the federal for the state forum. *Id.,* at 428. But short of that, he seldom can be said to have made such an election. For when he pursues the matter through the hierarchy of the state courts, he is doing only what he is *required* to do. The only time when he goes beyond that requirement is when he takes the fork in the road leading here rather than the one to the District Court.

## III.

If the *Pullman* doctrine is to be preserved, we should lighten rather than make more ponderous the procedures which we have been imposing. We have made *Pullman* mandatory, not discretionary, with the District Courts. As stated in *Louisiana P. & L. Co.* v. *Thibodaux,* 360 U. S. 25, 28, ". . . we have required District Courts,

and not merely sanctioned an exercise of their discretionary power, to stay their proceedings pending the submission of the state law question to state determination." So, no matter the ease with which the whole controversy can be resolved, parties are sent their weary and expensive way into the state tribunals. Whether or not we agree with MR. JUSTICE BLACK that the present case involves no substantial federal question, it certainly borders on the insubstantial; and a District Court, if it has that view of a case, should be allowed in its discretion to decide the whole case at once, avoiding the state litigation completely—free of interference here or in the Court of Appeals.

We have, moreover, extended the *Pullman* doctrine, contrary to our prior decision in *Propper* v. *Clark, supra,* at 491–492, to cases that involve no shadow of a substantial constitutional issue but only local law questions in the field of eminent domain.[2] *Louisiana P. & L. Co.* v. *Thibodaux, supra.* As my Brother BRENNAN said in dissent in that case:

> ". . . the Court attempts to carve out a new area in which, even though an adjudication by the federal court would not require the decision of federal constitutional questions, nor create friction with the State, the federal courts are encouraged to abnegate their responsibilities in diversity cases." 360 U. S., at 36–37.

Thus the *Pullman* doctrine reflects an antipathy to federal courts passing on state law questions.

---

[2] Some federal courts have used the doctrine to shuttle over to state courts cases properly in the federal court yet not involving constitutional issues dependent on the meaning of state law (see *Mottolese* v. *Kaufman,* 176 F. 2d 301; *Beiersdorf & Co.* v. *McGohey,* 187 F. 2d 14)—decisions which baldly deny a suitor the remedy granted by Congress because it is not convenient to the district judge to decide the case.

## IV.

There have been historic clashes between the federal courts and the States, some of them needless. See Warren, Federal and State Court Interference, 43 Harv. L. Rev. 345 (1930). The examples are numerous. Thus federal courts, free and easy with injunctions, interfered wholesale with public utility rate orders,[3] with efforts of the States to collect their revenue,[4] and with suits in state courts.[5] Prior to *Erie R. Co.* v. *Tompkins, supra,* the "mischievous results" (304 U. S., at 74) of the earlier rule of *Swift* v. *Tyson,* 16 Pet. 1, were apparent, federal courts by their formulation of "general law" often defeating legitimate state policies. 304 U. S., at 73–78. Federal courts, inflating the Due Process Clause of the Fourteenth Amendment, became a sort of super-legislature, reviewing the wisdom of a wide variety of state law. See, *e. g.,* *Lochner* v. *New York,* 198 U. S. 45; *Burns Baking Co.* v. *Bryan,* 264 U. S. 504.

Those chapters have ended, sometimes as a result of judicial housekeeping,[6] at other times as a consequence of federal legislation.[7] What mostly remain are clashes and conflicts between State and Nation inherent in the performance of the functions of a referee in the federal system. Such was the unavoidable consequence of the effort of the Marshall Court, beginning at least with *Gibbons*

[3] See S. Rep. No. 701, 72d Cong., 1st Sess., pp. 2–4; H. R. Rep. No. 1194, 73d Cong., 2d Sess., pp. 2–3; S. Rep. No. 125, 73d Cong., 1st Sess., pp. 3–9 on the Johnson Act of 1934, 28 U. S. C. § 1342.

[4] See S. Rep. No. 1035, 75th Cong., 1st Sess., p. 2, on the Tax Injunction Act of 1937. 28 U. S. C. § 1341.

[5] See *Toucey* v. *New York Life Ins. Co.,* 314 U. S. 118; 28 U. S. C. § 2283.

[6] See, *e. g., Day-Brite Lighting, Inc.,* v. *Missouri,* 342 U. S. 421; *Giboney* v. *Empire Storage Co.,* 336 U. S. 490; *Ferguson* v. *Skrupa,* 372 U. S. 726.

[7] See notes 3, 4, and 5, *supra.*

v. *Ogden,* 9 Wheat. 1, to create a great common market
within the grand design of the Commerce Clause.    Such
is the unavoidable consequence today when Negroes claim
the full benefits of the Fourteenth (see *Brown* v. *Board of
Education,* 347 U. S. 483; 349 U. S. 294), and Fifteenth
Amendments.    See *Alabama* v. *United States,* 304 F. 2d
583, aff'd 371 U. S. 37; *United States* v. *Raines,* 362 U. S.
17; *United States* v. *McElveen,* 180 F. Supp. 10, aff'd *sub
nom. United States* v. *Thomas,* 362 U. S. 58.

If we are to retain the *Pullman* doctrine, I think with
all deference, we should make it less of a mandatory and
more a discretionary procedure and lighten its require-
ments, rather than make them stricter.

We should permit the District Court to refer the matter
to the state court for a declaratory judgment only where
the State offers such relief.[8]    Otherwise, we should require
that the litigation be conducted in the federal court where
Congress decided it could be conducted.    In any event we
should leave it to the District Court to refuse to refer
the matter to the state courts, if, as here, there is no local
law question tangled in a maze of state statutes and state
decisions.

---

[8] Thirty-six States, plus Puerto Rico and the Virgin Islands, have
adopted the Uniform Declaratory Judgments Act.    See 9A Uniform
L. Ann. (1962 Cum. Ann. Pt.), p. 9.    Other States have special de-
claratory judgment statutes restricted to a litigation of a specified
issue or issues.    See I Anderson, Actions for Declaratory Judgments
(1959 Supp.), § 6.

In *Meridian* v. *Southern Bell T. & T. Co.,* 358 U. S. 639, in which
the District Court was ordered to stay its hand while the parties
repaired to the state court, the State involved, Mississippi, lacked
a declaratory judgment procedure.    See IV Martindale-Hubbell
(1963), p. 979.    A state court determination was obtained only when
the parties switched roles, with the city—a defendant in the federal
court declaratory judgment action—suing the telephone company for
noncompliance with the law originally challenged as unconstitutional.
The state action was resolved in the telephone company's favor.
*Southern Bell T. & T. Co.* v. *Meridian,* 241 Miss. 678, 131 So. 2d 666.

If we are to retain the *Pullman* doctrine, we should not weight it down by procedures, which, like today's decision, make it a trap for the unwary.

The *Pullman* doctrine, as it has evolved, is the least desirable alternative. It is better, I think, for the federal courts to decide local law questions, as they customarily do in the diversity cases, adding at the foot of the decree as Mr. Justice Cardozo, writing for a unanimous Court, did in *Lee* v. *Bickell,* 292 U. S. 415, 426:

"... that the parties to the suit or any of them may apply at any time to the court below, by bill or otherwise, as they may be advised, for a further order or decree, in case it shall appear that the statute has been then construed by the highest court of Florida as applicable to the transactions in controversy here."

Another alternative is for the District Court to follow the certificate route, when one is available. The Florida Supreme Court is authorized [9] to provide by Rule [10] for

[9] Fla. Stat. Ann., 1955, § 25.031, provides:

"The supreme court of this state may, by rule of court, provide that, when it shall appear to the supreme court of the United States, to any circuit court of appeals of the United States, or to the court of appeals of the District of Columbia, that there are involved in any proceeding before it questions or propositions of the laws of this state, which are determinative of the said cause, and there are no clear controlling precedents in the decisions of the supreme court of this state, such federal appellate court may certify such questions or propositions of the laws of this state to the supreme court of this state for instructions concerning such questions or propositions of state law, which certificate the supreme court of this state, by written opinion, may answer."

See Kurland, Toward A Co-operative Judicial Federalism, 24 F. R. D. 481, 489–490 (1959); Note, 73 Harv. L. Rev. 1358, 1368 (1960).

[10] Rule 4.61 of the Florida Appellate Rules provides:

"When it shall appear to the Supreme Court of the United States, or to any of the Courts of Appeal of the United States that there are involved in any proceeding before it questions or propositions of law of this state which are determinative of said cause and that there

answering certificates concerning state law questions tendered by the federal courts. We use that procedure [11] on Florida state law perplexities (*Dresner* v. *Tallahassee,* 375 U. S. 136; *Aldrich* v. *Aldrich,* 375 U. S. 75, 249). We cannot require the States to provide such a procedure; but by asserting the independence of the federal courts and insisting on prompt adjudications we will encourage its use.

## V.

After today's decision, application of the *Pullman* doctrine to the field of civil rights, particularly to controversies involving the rights of Negroes, will have, I think, serious effects. *Harrison* v. *NAACP,* 360 U. S. 167, and *NAACP* v. *Button, supra,* are harbingers of things to come. The complaint in those cases was filed November 28, 1956, and our decision on the merits was not announced until January 14, 1963. In other words, nearly seven years elapsed between the institution of the litigation and an adjudication on the merits. The end product could still be described as a sizable collision between Nation and State.

Cases where Negroes are prosecuted and convicted in state courts can find their way expeditiously to this Court, provided they present constitutional questions. Yet instances where Negroes assert their rights in judicial proceedings will continue to be numerous. Those suits will be civil ones and almost always instituted in the Federal

are no clear controlling precedents in the decisions of the Supreme Court of this state, such federal appellate court may certify such questions or propositions of law of this state to the Supreme Court of Florida for instructions concerning such questions or propositions of state law."

[11] As respects certificates from state courts on cases coming here, see *Herb* v. *Pitcairn,* 324 U. S. 117, 325 U. S. 77; *King* v. *Order of Travelers,* 333 U. S. 153, 160; Hart and Wechsler, The Federal Courts and the Federal System (1953), pp. 444–446.

District Courts, since those courts have a special competence in the field and a record of independence protective of the rights of unpopular minorities. That litigation more often than not entails construction of state statutes, city ordinances, state court decisions, rulings of state administrative commissions, and the like. Under the *Pullman* doctrine a Negro who starts in the federal court soon finds himself in the state court and his journey there may be not only weary and expensive but also long and drawn out. There will be no inclination to expedite his case. The whole weight of the *status quo* will be on the side of delay and procrastination. What we do today adds to the toll that the *Pullman* doctrine will take of civil rights.

The Bar is now told that if one repairs to the state courts and submits the state law question along with the federal constitutional questions, he will be presumed to have elected to pursue the state remedy, unless he makes clear a purpose to return to the federal court when the state court has made its ruling. I gather that, without that reservation, the record will be taken to mean that "he voluntarily litigated his federal claims in the state courts." Or, if he forgets or fails to make such a reservation, he can still preserve his right to return to the federal court by doing what the Court now says is required of him by *Windsor*. For he is told today that instead of submitting his federal claims to be "litigated," he may submit his state law questions only for consideration "in light of" the federal questions. Those who read this opinion may have adequate warning. But this opinion, like most, will become an obscure one—little known to the Bar. Lawyers do not keep up with all the nuances of court opinions, especially those touching on as exotic a rule of federal procedure as the one which we evolve today. I fear therefore that the rule we announce today will be a veritable trap.

The Court recognizes the value to the litigants of being in the federal court. As it says, "the benefit of a federal trial court's role in constructing a record and making fact findings" is considerable. *Ante,* at 416. A litigant trapped in state court proceedings may find himself veritably encased by findings of fact which no appellate court may disturb. The value of the independence of federal judges, and the value of an escape from local prejudices when fact findings are made are considerable ones. Yet under the rule we announce today, those values promise to be lost in important areas of civil rights.

I mention the time element as one of the evils spun by the *Pullman* doctrine. Time has a particularly noxious effect on explosive civil rights questions, where the problem only festers as grievances pile high and the law takes its slow, expensive pace to decide in years what should be decided promptly.

The late Judge Charles E. Clark made an apt and pertinent observation on the impact of the *Pullman* doctrine. At times, he said, "the upshot inevitably seems to be a negative decision or, in plain language, a defendant's judgment." [12] Delay which the *Pullman* doctrine sponsors, keeps the *status quo* entrenched and renders "a defendant's judgment" even in the face of constitutional requirements. These evils are all compounded by what we do today, making it likely that litigants seeking the protection of the federal courts for assertion of their civil rights [13] will be ground down slowly by the passage of

---

[12] Clark, The Limits of Judicial Objectivity, 12 Am. U. L. Rev. 1, 5 (1963).

[13] See Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 L. & Cont. Problems, 216, 229–230 (1948) discussing a proposed codification of the *Pullman* doctrine whereby the federal court would retain jurisdiction only in limited situations:

"These observations call for qualification in one instance: the rights of action specially conferred by Congress in the Civil Rights

time and the expenditure of money in state proceedings, leaving the ultimate remedy here, at least in many cases, an illusory one.

MR. JUSTICE BLACK, concurring in part and dissenting in part.

I join in the judgment and in the opinion insofar as the Court holds that the District Court erred in the reasons it gave for dismissing appellants' action. I am of the opinion, however, that the dismissal should be affirmed on the grounds relied upon by Judge J. Skelly Wright sitting alone in the District Court when the action first was brought: that the complaint failed to state a substantial federal question warranting exercise of jurisdiction. See *Hitchcock* v. *Collenberg,* 140 F. Supp. 894 (D. C. D. Md.), aff'd, 353 U. S. 919; cf. *Ex parte Poresky,* 290 U. S. 30. Compare *Louisiana State Board of Medical Examiners* v. *Fife,* 162 La. 681, 111 So. 58, aff'd, 274 U. S. 720; *Dent* v. *West Virginia,* 129 U. S. 114. See also Judge Wisdom's opinions dissenting from reversal of Judge Wright's ruling, 259 F. 2d 626, 627 (C. A. 5th Cir.), and 263 F. 2d 661, 674 (C. A. 5th Cir.). Although a petition for certiorari to review the decision of the Fifth Circuit was denied, 359 U. S. 1012, issues raised at that stage of the litigation which remain dispositive of the case are properly before us. *Urie* v. *Thompson,* 337 U. S. 163.

---

Laws. There Congress has declared the historic judgment that within this precious area, often calling for a trial by jury, there is to be no slightest risk of nullification by state process. The danger is unhappily not past. It would be moving in the wrong direction to reduce the jurisdiction in this field—not because the interest of the state is smaller in such cases, but because its interest is outweighed by other factors of the highest national concern. Needless to say, to formulate the scope of the exception is no drafting problem; its measure is the rights of action given by the Civil Rights Laws." *Id.,* at 230.