**EWE DISTRIBUTORS, INC. and Love Gas, Inc., Plaintiffs,**

v.

**Roderick W.G. CHU, individually and as Commissioner of the New York State Department of Taxation and Finance; Frank Munoz, individually and as Deputy Commissioner for Tax Enforcement of the New York State Department of Taxation and Finance, and Henry G. Williams, individually and as Commissioner of the New York State Department of Environmental Conservation, Defendants,**

v.

**HAMILTON OIL BROKERS, INC., Plaintiff-Intervenor.**

No. CV 85–4047.

United States District Court,
E.D. New York.

March 13, 1986.

Levine & Robinson, P.C. by Carl Levine, Mitchel Field, N.Y., for plaintiffs.

Gerald I. Steinhaus, Rockville Centre, N.Y., for plaintiff-intervenor.

Robert Abrams, New York State Atty. Gen. by Dewey Lee, Mineola, N.Y., for defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

## INTRODUCTION

New York State's perception of widespread corruption in the motor fuel industry has led to more active law enforcement and greater regulation of gasoline distribution throughout the state. This civil rights action, which pits the New York State Tax Commission against the owner and proposed operator of a gasoline storage facility, is a consequence of New York State's attempt to eliminate tax evasion in the industry. While concluding that the federal courts are not the appropriate forum for the resolution of this dispute, this Court suggests that this case has important lessons for New York State.[1]

Plaintiffs Ewe Distributors, Inc. ("Ewe Distributors") and Love Gas, Inc. ("Love Gas") commenced this action against Roderick W.G. Chu, Commissioner of New York State's Department of Taxation and Finance, Frank Munoz, Deputy Commissioner for Tax Enforcement, and Henry G. Williams, Commissioner of the Department of Environmental Conservation ("DEC") pursuant to 42 U.S.C. § 1983, for defend-

ants' collective refusal to allow plaintiff corporations to operate a gasoline storage facility located in Oceanside, New York (the "Oceanside Terminal" or the "Terminal"). Plaintiffs and plaintiff-intervenor Hamilton Oil Brokers, Inc. ("Hamilton Oil") seek to enjoin defendants from interfering with plaintiffs' use of the Oceanside Terminal. Plaintiffs also seek declaratory relief and damages. For the reasons stated below, the relief is denied, the complaint is dismissed, and judgment is entered for defendants.

## BACKGROUND

Pursuant to statute, New York State imposes a tax on the sale of motor fuel. N.Y.Tax L. §§ 282–89 (McKinney 1986). Prior to July 1985, the tax was collected from the consumer by the gasoline retailer; wholesalers were not taxed for sales made in the chain of distribution. N.Y.Tax L. § 284 (McKinney 1966). In 1984, however, the New York State tax authorities came to believe that the state was losing millions of dollars a year in motor fuel sales taxes.[2] The growing concern about sales tax evasion by gasoline distributors prompted state tax officials to investigate the motor fuel industry in an effort to stem the revenue loss. The Governor's Task Force on the Administration of Taxes on Petroleum Products and Businesses (the "Governor's Task Force") discovered subsequently that some gasoline distributors were employing a "daisy chain" scheme to avoid detection by state tax authorities.[3] State tax authorities proposed a legislative solution to the

---

**1.** See footnote 12.

**2.** The legislative history of the First Import Law, which was enacted as a solution to the tax evasion problem, noted that

This [Tax] evasion has promoted unfair competition and erosion of the State and local tax bases for which the Governor's Task Force on the Administration of Taxes on Petroleum Products and Businesses estimates an annual State local loss of at least $90 million. Industry estimates of the combined State and local revenue loss range as high as $200 million annually.

Memorandum in Support of the First Import Law at 1, Exhibit 7 of the Order to Show Cause, *New York State Tax Commission v. David Boga-*

*tin, Dutch Ventures, Inc., and Lesez Petroleum Corp.,* Index No. 12740/1985 (N.Y.Sup.Ct. Nassau Cty. July 18, 1985). The memorandum notes that gasoline sales tax revenue has declined in New York by five percent while the national gasoline use has increased. *Id.* at 9.

**3.** Before the enactment of the First Import Law, gasoline distributors could buy and sell gasoline from each other tax-free. Tax was imposed only when gasoline was sold to a non-distributor, i.e., to a motorist at a gasoline station. A "daisy chain" scheme typically involves multiple tax-free paper-sales of the same gasoline through several sham corporations in a short period of time. The taxable sale is then made by an insolvent distributor from whom no tax

problem and shortly thereafter in July 1985, the New York State Legislature enacted the First Import Law, which made all gasoline taxable upon initial importation into the state rather than upon sale to the consumer. N.Y.Tax L. § 285a (McKinney 1986).

The First Import Law enhanced the ability of New York State's Department of Taxation and Finance (the "Tax Commission") to detect and deter illegal tax-evasion schemes through new criminal sanctions and reporting requirements. The new enforcement provisions, along with existing provisions of the Tax Law under § 283, now gave the Tax Commission broad authority to restrain the sale of gasoline, suspend a distributor's registration, and obtain a summary court order prohibiting the sale or importation of gasoline. In addition, the new statutory scheme required that all gasoline distributors must register with the Tax Commission, post a bond, keep accurate and current records, and make those records available at any time upon the request of to the Tax Commission. N.Y.Tax L. § 283.

Subsequent to the passage of the First Import Law, Tax Commission investigators learned that quantities of untaxed gasoline had been delivered to the Oceanside Terminal, which was then owned by Dutch Ventures, Inc. ("Dutch Ventures"). Tax Commission investigators appeared before New York State Supreme Court Justice Sandifer and, on July 2, 1985, pursuant to N.Y.Tax L. § 283(7), obtained an *ex parte* summary order enjoining Dutch Ventures, its agents, and anyone who had received gasoline from Dutch Ventures, from selling or transferring any gasoline.[4] On July 23, 1985, the Tax Commission obtained a second *ex parte* summary order pursuant to § 283(7) from Nassau County Supreme Court Justice Alfred Samenga. This order also restrained Bogatin, Dutch Ventures, Lesez Petroleum, Inc. ("Lesez Petroleum"), and Valentino Motors, Inc. from selling or otherwise disposing of any gasoline. The second order differed from the order of July 2, 1985 only in that it was based on a separate time period. In all other respects, the two orders were identical.

The Tax Commission soon suspected that Judge Sandifer's order was being violated and, in an attempt to enforce the order, sought a finding of contempt against Dutch Ventures, David Bogatin, and Lesez Petroleum.[5] Prior to a hearing before Supreme Court Justice M. Hallstead Christ in Nassau County Supreme Court, the Tax Commission and Bogatin executed a stipulation requiring him, among other things, to post a $500,000 bond against sales tax liabilities, to cease doing business, and to close down the Oceanside Terminal. Paragraph 2(b) of the stipulation stated that

The Oceanside Terminal may resume operations or do business at such time when someone makes application to the New York State Tax Commission and The Tax Commission gives its express written consent in such terms and conditions as it deems fit. The Tax Commission will not unreasonably withhold its consent.

The stipulation consolidated all other legal proceedings involving these parties, ad-

---

can be collected. State detection and enforcement efforts have also been hampered by deliberate concealment of transfers.

**4.** Section 283(7) states that:

7. Whenever evidence is furnished by the tax commission to any justice of the supreme court, in court or at chambers, showing that any person not registered as a distributor as required by this section has imported motor fuel into this state or caused motor fuel to be imported into this state or has produced, refined, manufactured or compounded motor fuel within this state, such justice shall make a summary order prohibiting such person and his agents from selling such motor fuel or any

motor fuel illegally and also prohibiting all other persons from selling any motor fuel illegally sold by such persons until such person shall have registered, reported the sale of such motor fuel illegally sold and paid the tax therein or until the tax commission consents to such sale.

**5.** The Tax Commission alleged that David Bogatin was the "boss" of both Dutch Ventures, Inc. and Lesez Petroleum, Inc., that defendants had openly violated the July 2 order by continuing to import and sell gasoline, and that defendants violated the new tax law by failing to both register with the state and post a bond.

journed the contempt proceedings as necessary while the parties litigated the constitutionality of the underlying tax law, and gave Justice Christ continuing jurisdiction over the consolidated cases. The stipulation, which was so-ordered by Justice Christ, was recorded and filed in the Nassau County Clerk's Office on August 8, 1985. The so-ordered stipulation was therefore reflected in chain of title of the property on which the Oceanside Terminal is located and, under N.Y.R.P.L. § 297-b (McKinney 1985), all prospective purchasers were deemed to have notice of the Tax Commission's interest in the Oceanside Terminal. Bogatin has challenged the acts of the Tax Commission and the summary order provision of the Tax Law, N.Y.Tax L. § 283(7) (McKinney 1985), under the United States Constitution, the New York State Constitution, and various New York state statutes.

Late in August of the same year, Hamilton Oil sought the permission of the Tax Commission to operate the Oceanside Terminal.[6] On September 20, the Tax Commission denied Hamilton's application on the grounds that Hamilton Oil lacked sufficient experience to operate the Terminal. After learning of the denial, Hamilton Oil took no further action.

As a consequence of the so-ordered stipulation, on October 15, 1985 David Bogatin and his partner Michael Markowitz sold their interest in the Oceanside Terminal to Crossboro Energy, Inc. ("Crossboro"), a company wholly owned by Alexander Shkolnick.[7] Simultaneously, Bogatin and Markowitz resigned from their positions as officers and directors of Ewe Distributors and Love Gas. Two days later, on October 17, Carl Levine, plaintiffs' attorney, notified Deputy Commissioner Munoz of the sale and indicated Crossboro's intention to reopen the Oceanside Terminal and commence operations. Eleven days later on October 28, Levine again wrote Munoz, notifying him of a recently executed lease between Crossboro and Hamilton Oil and enclosing a copy of the lease for review by the Tax Commission. Levine stated expressly that the submission of the lease did not act as a waiver of Crossboro's contention that the Tax Commission had neither any interest in the Oceanside Terminal nor the right to review or reject the lease.[8] In this letter, Levine contended that the October 15 sale severed all ties between the Oceanside Terminal and its former owners and that neither Crossboro nor Shkolnick were bound by the state court stipulation.

On October 31, Munoz replied by letter, disagreeing with the contention that the Tax Commission had no interest in the Oceanside Terminal. Munoz indicated that if Crossboro sought to reopen the Terminal, the Tax Commission would move to have Crossboro held in contempt of the so-ordered stipulation. Munoz further stated that he would attempt to persuade DEC to deny Crossboro's application for environmental permits on the basis of the so-ordered stipulation.

Plaintiffs then commenced this action on November 6. On November 8, the Court denied a request for a temporary restraining order but by an Order to Show Cause directed that a hearing be held on a preliminary injunction. Upon motion, Hamilton Oil was joined as plaintiff-intervenor.[9]

---

**6.** Hamilton Oil is registered by the Tax Commission as a motor fuel distributor.

**7.** Shkolnick is the sole shareholder and president of Crossboro. Bogatin and Markowitz, who each owned fifty percent of the stock of Ewe Distributors and Love Gas, therefore owned the land and improvements constituting the Oceanside Terminal. In the October 15 agreement, Bogatin and Markowitz sold their interest in Ewe Distributors and Love Gas to Crossboro.

**8.** Levine's October 15 letter indicated that the Terminal would be re-opened after certain environmental licensing arising under N.Y. Navigation Law § 174 matters are concluded. The Court assumes that plaintiffs would have to secure permission from the DEC and that plaintiffs' relief seeks to prevent defendants Chu and Munoz from interfering with DEC's licensing procedure.

**9.** On October 26, Ewe Distributors and Love Gas, as the owners of the Oceanside Terminal, had executed a lease with Hamilton Oil to operate the Terminal.

Rule 20, Fed.R.Civ.P. Defendants moved to dismiss the complaint on the grounds of abstention and the Court directed the parties brief the issue.

A hearing was held before the Court on December 4, 5, and 6, 1985 on the twin issues of whether: (1) Crossboro, Shkolnick, or Hamilton were agents of Bogatin, Markowitz, Dutch Ventures, or Lesez Petroleum; and (2) Crossboro and Hamilton Oil are suitable operators of the Oceanside Terminal.

At the hearing, the evidence presented by the parties provided further background to this case. At one time Bogatin, Markowitz, *Joseph* Skolnick, and Lev Persits owned the Oceanside Terminal through their joint control of Ewe Distributors and Love Gas. Bogatin, Markowitz, and *Joseph* Skolnick, who is no relation to *Alexander* Shkolnick, have been under investigation by the New York State Attorney General for evasion of gasoline sales tax and were recently indicted in Florida for gasoline sales tax evasion. Joseph Skolnick sold his interest in the Terminal to Bogatin and Markowitz in 1984. Persits sold his interest on June 14, 1985, leaving Bogatin and Markowitz as the Terminal's sole owners. In October 1985 Toronto Enterprises, Inc. ("Toronto"), a company wholly owned by Persits, loaned *Alexander* Shkolnick slightly over $1 million, in order to buy the Oceanside Terminal from Bogatin and Markowitz. The loan was secured by a mortgage on the Terminal.

At about the same time, Persits loaned Alexander Shkolnick an additional $500,000 to help finance Shkolnick's $1.6 million purchase of an oil terminal in New Jersey. Shkolnick, who claimed to have known Persits for over twenty years, was unable to recall the amount Persits had loaned him, *i.e.* whether it was $500,000 or $643,000, and could not produce a promissory note or debt instrument to evidence the debt.

Crossboro, which is wholly owned by Shkolnick, was incorporated in June 1985. The owner of the residence given on Crossboro's certificate of incorporation as the place for service of process had never heard of either Crossboro or Alexander Shkolnick. Before the incorporation of Crossboro and Crossboro's acquisition of the Oceanside Terminal, Shkolnick had been employed by Hamilton Oil as a sales representative. Both Shkolnick and Hamiltons Oil's owner, John Byrne, admitted that Shkolnick had no prior experience in the petroleum industry. On the basis of this and other evidence presented at the hearing, the Court concluded that Toronto, Crossboro, and three corporations that sold gas to Hamilton Oil were sham corporations.[10]

## DISCUSSION

With this factual background, the Court turns to defendant's broadly framed motion to dismiss. Defendants contend that the doctrine of absention, the Anti-Injunction Act, 28 U.S.C. § 2283, and the Tax

---

**10.** The evidence giving rise to the Court's conclusion is as follows. In 1985, Hamilton Oil conducted no business before April and none after August. During the summer months of 1985, nearly all of the gasoline purchased by Hamilton Oil (93%) was bought from two companies, R.B. Labs, Inc. and Baisley Park Neighborhood Center. With respect to R.B. Labs, Tax Commission investigators discovered that the company's address was a motel in North Bergen, New Jersey. The motel's owner testified that a person using the corporate name R.B. Labs had registered at the motel for 2 days in June 1985 and that the motel was holding a sizable amount of unclaimed mail for R.B. Labs, Inc., including new company checks with the motel's address on them. Baisley Park Neighborhood Center's address was a two-story

home in Jamaica, New York. The homeowner testified that neither he nor his long-term tenant, a bank employee, had any connection with the gasoline industry.

Much of the gasoline bought by Hamilton Oil was sold to a company called Ridge Rich. The address given for Ridge Rich does not exist and the nearest address is a home for retired priests. John Byrne, Hamilton Oil's sole owner, testified that he had never met anyone from either R.B. Labs, Inc. or Ridge Rich and had never made payments to R.B. Labs, Inc., but always to third parties. No one from R.B. Labs, Inc., Baisley Park Neighborhood Center, or Ridge Rich appeared at the hearing. On the basis of this evidence, the Court concluded that these companies were sham corporations.

Injunction Act, 28 U.S.C. § 1341, require this Court to dismiss the complaint.

As a general rule, the federal courts are under a "virtually unflagging obligation ... to exercise the jurisdiction given them." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). Although abstention is clearly the exception rather than the rule, there are clearly marked instances where important countervailing interests are served by allowing the state court to resolve the dispute. *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1062–63, 3 L.Ed.2d 1163 (1959).

Under the holding of the Supreme Court in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a federal court may abstain "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *County of Allegheny*, 360 U.S. at 189, 79 S.Ct. at 1063. The essence of the *Pullman* doctrine is that there be an unsettled question of state law. *West v. Village of Morrisville*, 728 F.2d 130 (2d Cir.1984). Federal courts should, in the interest of federal-state comity, avoid forecasting the interpretation of a state law. This is true particularly when the state law is part of an integrated regulatory scheme or when the state law has no parallel federal provision. *See Harris County Commissioners Court v. Moore*, 420 U.S. 77, 84 n. 8, 95 S.Ct. 870, 876 n. 8, 43 L.Ed.2d 32 (1975).

In this case, there are at least three issues of unsettled state law. The first issue is whether Justice Christ's so-ordered stipulation extends to plaintiffs' interest in the Terminal. If it does, plaintiffs could be subject to contempt if they re-opened the Terminal. If it does not, then no due process interest is implicated because neither the summary order nor the so-ordered stip-

ulation would prevent commencement of operations at the Oceanside Terminal. In either instance, that issue should be decided by Justice Christ, the state judge who so-ordered the stipulation, retains jurisdiction over the case, and, therefore, would be in the best position to interpret its provisions.

The second issue is whether the Tax Commission exceeded the scope of the summary order provision, N.Y.Tax L. § 283(7) (McKinney 1985), either when it obtained the two summary orders or sought to enforce them. Assuming that the Tax Commission did not comply with the requirements of § 283(7), then the summary orders could be set aside and plaintiffs would not face the spectre of contempt. Again, this issue of state law is best decided by a state judge. Section 283(7), which has no federal counterpart, is not a general judicial remedy under the CPLR, but is found only in New York's tax law and is part of the state's statutory scheme to regulate the motor fuel industry. Therefore, the interpretation of § 283(7) in any particular context should be left to New York State Supreme Court Justices, who are most familiar with the workings of the statute.

The third issue of unsettled state law is whether § 283(7) violates federal or state law. Although this Court is competent to examine the validity of § 283(7) on both federal and state grounds, there is hardly any reason to do so because those issues are already before Justice Christ. If Justice Christ decides that § 283(7) violates the state constitution or New York statutes, then this case would be mooted and there would be no need for this Court to address the federal constitutional issue.[11] This Court is also reluctant to address the federal constitutional issue because of the paucity of state judicial precedent. Although § 283(7) has long been a part of New York's tax laws, *see* 1935 N.Y.Laws c.

---

11. Because the state defendants have argued before Justice Christ that § 283(7) should be set aside on these very grounds, this Court takes no position on the merits of that lawsuit or the legality of § 283(7). Although the state defendants have also argued that § 283(7) as applied

violates the due process clause, fourth amendment, and the double jeopardy clauses of the United States Constitution, the state defendants contend that there are independent and adequate state grounds to invalidate § 283(7) and the two summary orders.

154, this Court's research does not reveal any prior state or federal court challenge. Justice Christ is therefore faced with an apparent question of first impression.

■■■ Plaintiffs argue that the *Pullman* doctrine is inapplicable because there are no state court proceedings involving them and there is no likelihood that the federal due process issue before this Court will be mooted by a state court decision on unsettled or pertinent state law. The Court disagrees. The existence of a pending state court action is not a prerequisite to *Pullman*-type abstention. *Connecticut State Federation of Teachers v. Board of Education,* 538 F.2d 471, 485 n. 10 (2d Cir.1976); *Freda v. Lavine,* 494 F.2d 107, 110 (2d Cir.1974). The existence of a state court action that could resolve the state law issue is merely one factor in the determination of whether the federal court should abstain. *West v. Village of Morrisville,* 728 F.2d 130 (2d Cir.1984); C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4242 n. 49 (1978). In any event, there is already a pending state proceeding which could moot the instant case, *i.e.* the state case over which Justice Christ has continuing jurisdiction. Although Shkolnick and plaintiff corporations are not presently parties in the state contempt proceedings, it is clear to this Court from Deputy Commissioner Munoz's October 31 letter that they would promptly become defendants if they sought to reopen the Terminal. Furthermore because plaintiff's interests are implicated in the state court proceeding, they could easily seek intervention, N.Y.Civ.Prac.L.R. § 1002(b) (McKinney 1985), thereby minimizing the consequence of having to commence a new action in state court.

*Pullman*-type abstention also requires that the Court consider any possible prejudice to plaintiffs. *West v. Village of Morrisville,* 728 F.2d 130, 135 (2d Cir.1984). In this case, this consideration weighs heavily against plaintiff corporations and Shkolnick, their owner. There will be no great delay if plaintiffs are compelled to litigate in a state forum. This action was only filed in November 1985, and there has been no discovery beyond the evidence presented at the preliminary hearing. This case proceeded on an expedited basis and the Court rendered a bench ruling in advance of this written opinion.

Most importantly, however, abstention by this Court will not prejudice plaintiffs' opportunities to litigate their federal constitutional issues. Assuming that Justice Christ does not moot the instant case on state statutory grounds, federal constitutional challenges are already before him. Plaintiffs may always, of course, preserve their federal issues for ultimate review by a federal court if the state issues are decided unfavorably to them in state court. *See England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 421, 84 S.Ct. 461, 467, 11 L.Ed.2d 440 (1964).

Furthermore, plaintiffs' conduct evinces an apparent desire to avoid a resolution of the state law issues when a state court forum was readily available. Shkolnick was on notice that the Oceanside Terminal could only be re-opened with the consent of the Tax Commission. But, unlike Hamilton, Shkolnick did not seek the consent of the Tax Commission. Instead he merely informed the Tax Commission that he would re-open the Terminal. Shkolnick later informed the Tax Commission that the Oceanside Terminal's operator would be Hamilton, an entity that Shkolnick knew the Tax Commission had already disapproved for operation of the Terminal. After Commissioner Munoz alerted Shkolnick to the possibility of a contempt citation, Shkolnick's next step was not to intervene in the proceedings before Justice Christ, but to commence an action in this Court. Plaintiffs' disavowal of any link to the pending state contempt proceeding ignores the rapidly expanding state court litigation concerning the Oceanside Terminal. Merely because plaintiffs were able to initiate a lawsuit in federal court before they were faced with an impending summary contempt proceeding does not make the *Pull-*

*man* doctrine inapplicable on the ground that plaintiffs are not yet a party to a pending state court proceeding.

Therefore, the Court concludes that there will be no prejudice to plaintiffs if they must proceed in state court because any delay will be minimal. Furthermore, the Court's decision to abstain furthers another policy behind the *Pullman* doctrine, avoiding piecemeal and duplicative litigation. *See Canaday v. Koch*, 608 F.Supp. 1460, 1475 (S.D.N.Y.1985).

## CONCLUSION

Because the Court decides that the *Pullman* doctrine controls the disposition of this case, it is unnecessary to reach the other grounds for dismissal advanced by defendants.[12]

Accordingly, the complaint is dismissed without prejudice. *See Harris County Commissioners Court v. Moore*, 420 U.S. 77, 88–89 n. 14, 95 S.Ct. 870, 876 n. 14, 43 L.Ed.2d 32 (1975). The Clerk of the Court is directed to enter judgment for defendants.

SO ORDERED.

---

12. Although the Court does not reach the issue of whether abstention would be proper under *Burford v. Sun Oil*, 319 U.S. 315, 63 U.S. 1098, 87 L.Ed. 1424 (1943), the Court notes, as it did in the evidentiary hearing, that even after the passage of the First Import Law, it is by no means clear that New York has adopted a unified legislative scheme for regulating gasoline terminals such as the Oceanside Terminal. For example, as the Court observed during the hearing, no license is required to operate a gasoline storage facility aside from certain environmental permits. N.Y. Navigation L. § 174. Therefore, there is no state licensing procedure, no hearing, and no provision for review of an unfavorable administrative determination. Normally, a prospective operator would not be required to obtain consent from the Tax Commission to either own or operate a facility. Consent is required with respect to the Oceanside Terminal only because paragraph 2(b) of Justice Christ's so-ordered stipulation seems to require it.