232 So.2d 328 (1969)
Julia Chambers STOKES et al.,
v.
AETNA CASUALTY AND SURETY COMPANY et al.
No. 7766.
Court of Appeal of Louisiana, First Circuit.
November 17, 1969.
Rehearing Denied January 21, 1970.
Writ Granted March 12, 1970.
*329 Nathan E. Wilson, Vanue B. Lacour, Baton Rouge, for appellant.
Daniel Atkinson, of Dale, Richardson & Dale, W. Henson Moore, Baton Rouge, for appellee.
Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
The issue presented by this appeal is whether illegitimate children are entitled to workmen's compensation benefits from the employer and insurer of their deceased father, notwithstanding the decedent left legitimate offspring in sufficient number to exhaust maximum benefits payable under the law. The trial court resolved the question adversely to the illegitimates involved. We affirm the result reached below.
No dispute exists as regards the pertinent facts and circumstances. Henry Clyde Stokes died June 22, 1967, of injuries received the previous day during the course and within the scope of his employment by Earl Gibbon Transport, Inc., the insured of defendant Aetna Casualty and Surety Company (Aetna). At the time of his death, Stokes was lawfully married to but living separate and apart from Adelaide Jones Stokes. Of this union four legitimate children were born, namely, Harriet Stokes, born February 17, 1956; Hattie Marie Stokes, born in February, 1959; Henry Clyde Stokes, Jr., born September 23, 1960, and Anthony Stokes, born August 18, 1963.
For three years preceding his demise, decedent lived in a "common law union" with Willie Mae Weber, who bore decedent a daughter, Lisa (Letha) Marie Weber, born April 27, 1966. Of this same illicit relationship a child, Joseph Lee Weber, was born posthumously on January 4, 1968.
It is stipulated in this case that decedent and his four offspring lived openly with Willie Mae Weber in a single household as a family unit. It is also stipulated the "common law wife" and all five children were dependent upon decedent for support *330 and maintenance. We note, however, these stipulations are to some extent contrary to our factual findings in State ex rel. Stokes v. Stokes, La.App., 222 So.2d 573.
Following decedent's death a claim for workmen's compensation benefits was instituted by Julia Chambers Stokes, mother of decedent, against decedent's employer and Aetna claiming maximum compensation benefits for her four legitimate grandchildren. Defendant employer and insurer responded with an answer and reconventional demand converting the proceeding into a concursus. Defendants also impleaded Willie Mae Weber who was directed to assert any rights she might have on behalf of the illegitimate children. Willie Mae Weber answered asserting dependency of herself and her child, Lisa (Letha) Marie Weber, on decedent. She prayed that "she, together with her minor child, Lisa Marie Weber, be recognized and declared to be dependent members of the decedent's family and as such entitled to compensation according to law."
The accident which caused decedent's death occurred under circumstances giving rise to an action in tort against a third party. On behalf of the four legitimate children an action in tort was instituted against the third party tort-feasor. This claim was settled and compromised by payment to the legitimate children of a sum in excess of maximum recoverable workmen's compensation benefits. Subsequently the compensation claim of the legitimate children was dismissed. Defendant employer and insurer then moved rejection of the claim on behalf of the two illegitimate offspring on the ground that the four legitimate children exhausted all compensation benefits payable. On this premise it was urged the two illegitimate claimants are without any right of recovery under the provisions of the Louisiana Workmen's Compensation Law. Appellant concedes the claim of the four legitimate children exhausted all benefits for which defendant-employer was liable. However, appellant resisted the motion to dismiss on the ground that denial of compensation benefits to the illegitimate children is violative of the Equal Protection and Due Process clauses of the Fourteenth Amendment to the Constitution of the United States. Appellant then prayed for judgment in her favor "for the use and benefit of the minors Lisa Marie Weber and Joseph Lee Weber for the scheduled amount of compensation according to law." In further response to defendants' motion to dismiss, appellant repeated the special plea that rejection of the compensation demands of the two illegitimates because of their birth out of wedlock would deny them the equal protection and due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States.
In Louisiana the rights of children to workmen's compensation benefits are provided for in LSA-R.S. 23:1232. Paragraph (6) of the statute stipulates if there are three or more children, they shall divide among them compensation equivalent to sixty-five per cent of dceedent's wages. LSA-R.S. 23:1202 (as of the date of decedent's death) provides maximum benefits of $35.00 per week.
Appellant concedes that prior to the advent of Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (May 20, 1968), and Glona v. American Guarantee & Liability Insurance Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (May 20, 1968), in this state unacknowledged illegitimates were not deemed "children" within the meaning of the term as employed in LSA-R.S. 23:1232(6). Appellant further acknowledges that before Levy, above, acknowledged illegitimates qualified under LSA-R.S. 23:1232(8) as "other dependents" but on authority of Thompson v. Vestal Lumber & Mfg. Co., 208 La. 83, 22 So.2d 842; Fidelity and Casualty Company of New York v. Ivory, La.App., 129 So.2d 894, and Jenkins v. Pemberton, La.App., 87 So.2d 775, such persons were entitled to compensation benefits only to the extent legitimate issue failed to exhaust maximum benefits payable.
*331 Counsel for appellant argues, however, that the above cited statute and authorities, relegate acknowledged illegitimates to a secondary role resulting in an invidious discrimination against a certain class of individuals. On this basis it is contended our former law and jurisprudence must yield to the rule announced by the Supreme Court of the United States in Levy and Glona, supra, and followed by our own Supreme Court in Levy v. State Through Charity Hospital of Louisiana, see 253 La. 73, 216 So.2d 818.
Appellant acknowledges Levy, above, is factually different from the case at bar. In Levy the illegitimate children of a deceased mother claimed damages in tort under our general tort law as set forth in LA-R.C.C. Article 2315. Here the illicit offspring are seeking compensation benefits allegedly due because of the death of their father. We note one further material distinction between Levy and Glona, above, and the case at bar. In the cited authorities, it does not appear that either decedent left legitimate issue.
Nevertheless, appellant contends the thrust of Levy and Glona, above, "in their broad sweep invalidate discrimination against illegitimate children in all areas of substantive legal right" and adds that "the pronouncement of those cases seems particularly applicable to the narrow issue of this case." Continuing his argument, counsel notes that except for marriage, the illegitimates concerned were part of decedent's family living under the same roof in a common household with their legitimate sisters and brothers, their father and their mother who was the step-mother of the legitimate children. Because the illegitimates were equally supported by their father, it is contended an invidious discrimination results by denying them the subsistence intended to be provided by the Louisiana Workmen's Compensation Law.
Counsel does not particularize the proportionate share of compensation benefits to which the illegitimates are presumably entitled. We assume the contention is that each out of wedlock child is entitled to one-sixth of the benefits provided by law.
On the other hand, appellees maintain the rule in Levy is so revolutionary and far reaching that the application of the doctrine therein announced must be confined to the circumstances involved therein. On this basis appellees argue Levy should be confined to situations where illegitimates seek recovery from a tort-feasor who would otherwise escape liability for his tortious act.
We find, hoever, it is unnecessary to a determination of this matter that consideration be given to the extent of Levy's application in the field of substantive law.
We so conclude because we find there can be no recovery by present claimants under any legal concept without according Levy retroactive effect. The demise with which we are here concerned antedated the Levy decision. To apply Levy in retrospect would, in our view, violate vested rights enjoyed by defendant-employer and its insurer.
The general rule respecting prospective or retrospective operation of laws and the definition and application of the principle is stated as follows in 50 Am.Jur., Verbo Statutes, § 475 and 476, pages 492 and 493, as follows:
"§ 475. Generally.In the absence of an express constitutional inhibition retrospective laws are not prohibited as such. Moreover, the Constitution of the United States does not in terms prohibit the enactment by the states of retrospective laws which do not impair the obligation of contracts or partake of the character of ex post facto laws. Thus, prior to the enactment of the Fourteenth Amendment to the Federal Constitution, a retrospective law, unless falling within other constitutional inhibitions, could constitutionally operate to divest property rights. After the passage of the Fourteenth Amendment, however, the protection *332 afforded by the due process clause was extended so as to prevent retrospective laws from divesting rights of property or vested rights generally. In many of the states there are constitutional provisions expressly prohibiting not only the passage of any ex post facto law or law impairing the obligation of contracts, but any statute retrospective in its operation. In other states there are no constitutional provisions directly forbidding the enactment of retrospective laws. In this subdivision, principles and rules are considered, which determine whether a statute operates retrospectively, or merely prospectively, as distinguished from the constitutional authority of the legislature to enact a retrospective law.
§ 476. Definitions and Applications Thereof.A retrospective law, in the legal sense, is one which takes away or impairs vested rights acquired under existing laws, or creates a new obligation and imposes a new duty, or attaches a new disability, in respect of transactions or considerations already past. It may also be defined as one which changes or injuriously affects a present right by going behind it and giving efficacy to anterior circumstances to defeat it, which they had not when the right accrued, or which relates back to and gives to a previous transaction some different legal effect from that which it had under the law when it occurred."
Our own Constitution, Article 4, Section 15, provides in express terms that vested rights shall not be divested, unless for purposes of public utility.
The Louisiana Supreme Court has defined a right as vested when the right to its enjoyment, present or prospective, has become the property of some person as a present interest. In addition, the right must be absolute, complete and unconditional, independent of a contingency. Tennant v. Russell, 214 La. 1046, 39 So.2d 726.
Under our law as it existed at the time the present claim arose, defendant-employer and its insurer were vested with the right to be free of liability for workmen's compensation benefits upon the dependent legitimate children of decedent effecting a settlement in tort with the third party tort-feasor in excess of the maximum compensation due pursuant to the Louisiana Statute. To now hold that present claimants are entitled to demand benefits from defendant-employer would divest defendants of the privilege formerly enjoyed. It would strip both employer and insurer of an immunity from liability heretofore actually, fully and completely possessed under valid state law. This immunity, once accrued, became a vested property right subject to protection of the vested rights concept set forth in Article 4, Section 15, of our State Constitution.
We note the Federal Authorities, based on the due process clause of the Fourteenth Amendment to the United States Constitution, have likewise recognized, applied and enforced the vested rights principle in considering retrospective application of Federal Laws. See Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L. Ed. 1434.
The Federal Rule regarding retrospective application of decisions of the United States Supreme Court is set forth in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601. The cited authority held that the decision rendered in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081, 84 A.L.R.2d 933, requiring exclusion, in state criminal trials, of evidence seized in violation of the search and seizure provisions of the Fourth Amendment to the United States Constitution, did not operate retrospectively upon cases finally decided prior to Mapp. In so concluding, the United States Supreme Court reviewed the common law history and theory of the subject of retrospective application of judicial decisions. The court noted the "Blackstonian view" to the effect that judicial *333 opinions do not pronounce a new law but expound the old one. The theory here is that unconstitutional action confers no rights, imposes no duties, affords no protection and, in legal contemplation, is as inoperative as if it never existed. According to this view, no authority existed for the proposition that judicial decrees made law only for the future.
The court likewise noted the "Austin concept" which holds that judicial decisions make law. This view holds that overruling of a prior decision implies admission that the former case was erroneously decided. However, the former decree is not considered erased by the latter overruling opinion. Rather, it is deemed an existing juridical fact until overruled and intermediate cases finally decided under it are not to be disturbed. In Linkletter, above, the court then considered several specific instances in which the subject matter was discussed, including Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360, in which it was held that in determining constitutionality, the existence of the prior law is an operative fact which may have consequences which cannot be ignored. The decision also held that "The past cannot always be erased by a new judicial declaration. * * * the effect of the subsequent ruling as to invalidity may have to be considered in various aspects."
The Supreme Court in Linkletter, above, then stated its rule as follows:
"While the cases discussed above deal with the invalidity of statutes or the effect of a decision overturning long-established common-law rules, there seems to be no impedimentconstitutional or philosophicalto the use of the same rule in the constitutional area where the exigencies of the situation require such an application. It is true that heretofore, without discussion, we have applied new constitutional rules to cases finalized before the promulgation of the rule. Petitioner contends that our method of resolving those prior cases demonstrates that an absolute rule of retroaction prevails in the area of constitutional adjudication. However, we believe that the Constitution neither prohibits nor requires retrospective effect. As Justice Cardozo said, `We think the federal constitution has no voice upon the subject.'
Once the premise is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. * * *"
Our jurisprudence is to the effect that a compromise of a lawsuit has the same effect as a decision by the court. See La.R. C.C. Article 3078. When the legitimate children of decedent compromised and settled with the third party tort-feasor and dismissed their claim for compensation against defendants, the rights of defendants to immunity from compensation attached.
Unquestionably the effect of Levy, if applied as urged by counsel for appellants, would have far reaching and devastating results. Law and jurisprudence of long standing would be changed radically. Settled legal duties and relationships would be materially altered. Obligations which did not heretofore exist would be created and applied in retrospect by judicial fiat. Immunities presently enjoyed would be eliminated. We can readily conceive the chaos resulting in the field of property ownership and inheritance resulting from retrospective application of a law giving illegitimates equal rights with legitimates as appellants would have us do.
Weighing the readily foreseeable results of retrospective application of Levy, we are of the view it cannot be accorded retroactive effect.
*334 The judgment of the trial court is affirmed at appellant's cost.
Affirmed.

On Application for Rehearing
PER CURIAM.
On application for rehearing counsel for appellant notes that the death in Levy v. Louisiana, above, as in the instant case, preceded the Levy decision. Counsel also notes the ruling in Levy was applied retroactively therein to a case on direct review. On this basis counsel argues we held contrary to Levy in denying retroactive effect to the case at hand on the ground that Stokes' death preceded the Levy decision. The premise is that since this case was on direct review when Levy was rendered, Levy should be applied retroactively herein. The analogy shown is not per se decisive of the issue of retroactive application of Levy to a case arising under statutory provisions and jurisprudence different from that involved in Levy, even though such other case may have been on direct review when Levy was rendered.
Applicant also maintains "the non-retroactive holding in Linkletter" is concerned with the applicability of an overruling decision on a procedural rule to prior final judgments. Therefore, it is not applicable to the Stokes pronouncement which is a first impression decision on a substantive right to a claim which has not been adjudicated at the time of the Levy decision.
The question of retroactive application of judicial decisions pronouncing new rules and concepts of law, is one that has long perplexed the Courts at all levels. Concededly the area is permeated with constitutional issues of extreme intricacy and fineness in distinction. While we are of the view that applicant's contention is without merit, we deem the instant case sufficiently important to justify further explanation for our initial conclusion respecting the issue of retroactivity.
In Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601, the United States Supreme Court declined to apply Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, which held as a matter of due process, evidence obtained by search and seizure in violation of the Fourth Amendment is inadmissible in a state court as it is in a federal court, to fact situations finally adjudicated prior to Mapp. In the course of determining the application of Mapp, the Supreme Court considered, at some length, the concept of retroactivity of legislative and judicial changes in the law.
Citing England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440; Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360, and the concurring opinion of Frankfurter, J., in Griffin v. Illinois, 351 U.S. 12, 20, 76 S.Ct. 585, 100 L.Ed. 891, the Supreme Court unequivocally declared its authority to render decisions which are purely prospective in application, even to the extent that a ruling shall not apply to the case in which it is pronounced.
Analyzing the above cited authorities, we find that in Sunburst Oil, above, the issue was whether the Supreme Court of Montana could, in interpreting a statute, deny recovery of excessive and unreasonable rates purely prospectively but allow recovery thereof as to transactions made previous to its decision, without violating the constitutional right of due process. After noting that the parties concerned in Sunburst Oil, above, had bargained on the basis of a prior Montana decision allowing recovery of excessive and unreasonable rates, the United States Supreme Court concluded the Montana Court could make its changes in its law applicable purely prospectively. Sunburst Oil, above, cites Gelpcke v. City of Dubuque, 1 Wall. 175, 17 L.Ed. 520, as authority for the foregoing proposition when injustice and hardship are averted. The court also observed that *335 the Federal Constitution "has no voice in such a matter."
England v. Louisiana State Board of Medical Examiners, above, holds that a litigant in a federal court, who is remitted to a state court under the doctrine of abstention, may preserve his right to return to the federal court for disposition of his federal contentions by refusing to litigate federal issues in the state court. Although the litigants in England, above, failed to preserve their right to federal adjudication of their federal claims, the Supreme Court declined to apply the announced rule to the parties before the court and declared the established principle would be applied purely prospectively. In reaching its decision, the Court deemed it significant that the litigants had relied on a prior Supreme Court case.
After establishing its authority to make purely prospective changes in the law, Linkletter, above, cites with approval Gelpcke v. Dubuque, above, and Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329.
We note that Gelpcke v. Dubuque, above, was an action to recover the amount due on coupons or interest warrants originally attached to certain bonds issued by the City of Dubuque. Prior state court decisions had held the bonds valid. It was urged before the United States Supreme Court that State ex rel. Burlington & M. R. R. Co. v. County of Wapello, 13 Iowa, 388, 390, a subsequent state court decision, overruled the previous decisions relied upon by plaintiff. In declaring petitioner entitled to recover on his bonds, the Supreme Court stated:
"However, we may regard the late case in Iowa as affecting the future, it can have no effect upon the past. `The sound and true rule is, that if the contract, when made, was valid by the laws of the State as then expounded by all the departments of the government, and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent action of legislation, or decision of its courts altering the construction of the law.' Ohio Life [Insurance] & Trust Co. v. Debolt, 16 How. [416] 432. [14 L.Ed. 997]
The same principle applies where there is a change of judicial decision as to the constitutional power of the Legislature to enact the law. To this rule, thus enlarged, we adhere. It is the law of this court. It rests upon the plainest principles of justice. To hold otherwise would be as unjust as to hold that rights acquired under a statute may be lost by its repeal. The rule embraces this case."
In Chicot County Drainage District, above, plaintiffs sought recovery on bonds issued by a drainage district. Pursuant to a Municipal Debts Readjustment Act, a Federal District Court ordered financial reorganization of the issuing authority. Included in the mandate was the requirement that all holders of previously issued bonds exchange their securities within one year. Subsequently, however, in Ashton v. Cameron County Water Improvement District, 298 U.S. 513, 56 S.Ct. 892, 80 L. Ed. 1309, the United States Supreme Court held unconstitutional the statute on which the Federal District Court based its reorganization decree. In holding that its subsequent decision did not preserve plaintiff's rights as a bondholder after one year elapsed from the date of the District Court's judgment, the Supreme Court stated:
"It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken wtih qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,with respect to particular relations, individual and corporate, and particular conduct, private *336 and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature of both of the statute and of its previous application, demand examination."
Not only does Linkletter, above, establish that changes in law, whether substantive or procedural, may be accorded prospective application only, it proceeds to establish guidelines by which the issue of retroactive versus prospective application is to be determined. In this regard we note the following in Linkletter:
"Under our cases it appears (1) that a change in law will be given effect while a case is on direct review, Schooner Peggy, supra, and (2) that the effect of the subsequent ruling of invalidity on prior final judgments when collaterally attacked is subject to no set `principle of absolute retroactive invalidity' but depends upon a consideration of `particular relations * * * and particular conduct * * * of rights claimed to have become vested, of status, of prior determinations deemed to have finality'; and `of public policy in the light of the nature both of the statute and of its previous application.' Chicot County Drainage Dist. v. Baxter State Bank, supra, 308 U.S. at 374, 60 S.Ct. at 319, [84 L.Ed. at 333].
That no distinction was drawn between civil and criminal litigation is shown by the language used not only in Schooner Peggy, supra, and Chicot County, supra, but also in such cases as State v. Jones, 44 N.M. 623, 107 P.2d 324 (1940) and James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961)."
In United States v. Schooner Peggy, 1 Cranch 103, 2 L.Ed. 49, a distinction was noted as regards retroactivity between cases involving private individuals and cases where national interests are concerned. Schooner Peggy, above, involved the capture of a French vessel by an American ship commissioned by the President of the United States with orders to take any armed French vessel sailing under authority of the Republic of France. The seizure was ruled valid by a lower Federal Court. Before the matter could be decided on a writ of error to the Supreme Court, agreement was reached between the United States and France prohibiting such seizures in all cases where the condemnation had not become final. In holding that the decree of the lower Federal Court was not final and in ordering restoration of the vessel, the United States Supreme Court stated:
"The last decree of an inferior court is final in relation to the power of that court, but not in relation to the property itself, unless it be acquiesced under. The terms used in the treaty seem to apply to the actual condition of the property, and to direct a restoration of that which is still in controversy between the parties."
The United States Supreme Court in Schooner Peggy, above, then proceeded to distinguish between retroactivity when only private citizens were concerned as differentiated between instances involving matters of great national import. In this regard the court noted:
"It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns, where individual rights, acquired by war, are sacrificed for national purposes, the contract making the sacrifice ought always to receive a construction conforming to its manifest import, and if the nation has given up the vested rights of its citizens, it is not for the court, but for the government, to consider whether it be a case proper for compensation. Cranch 1"
The issue in James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246, was *337 whether embezzled funds should be included as "gross income" of the embezzler in the year in which the misappropriation occurs, pursuant to Sec. 22(a) of the Internal Revenue Code of 1939, and Sec. 61 (a) of the Internal Revenue Code of 1954. Prior to James, above, the Supreme Court had held in Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, that embezzled funds do not constitute taxable income pursuant to Sec. 22(a) above. Six years subsequent to Wilcox, above, the Supreme Court, in Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, held that extorted money is deemed taxable income to the extortionist. On review, the Supreme Court in James v. United States, above, held that the Rutkin decision, above, had changed the Wilcox rule. The Court, however, set aside petitioner's conviction upon finding he relied upon Wilcox in not reporting embezzled income. We note that in James, above, a criminal case, the Supreme Court declined to retroactively apply the constitutional rule proclaimed in Rutkin, above, even though James was on direct review when Rutkin was decided.
We note that in Linkletter, above, the Court, in referring to James, above, and the question of reliance, as pertains to the retroactive or prospective application of decisions, stated the following:
"In the latter case, this Court laid down a prospective principle in overruling Commissioner [of Internal Revenue] v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, `in a manner that will not prejudice those who might have relied on it.' At 221 of 366 U.S., 81 S.Ct. at 1056, [6 L.Ed.2d at 254]. Thus, the accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective."
It should also be noted that Linkletter, above, declared that legislative and judicial changes in the law will be applied to both civil and criminal cases on direct review. However, since Linkletter dealt solely with a criminal matter, it would appear that its pronouncements regarding retroactivity in civil cases are mere dictum. Additionally, application of the "direct review" rule announced in Linkletter to civil cases appears to conflict with the authorities cited in support of the proposition stated.
For example, in Schooner Peggy, above, the court observed that in civil cases a change in the law will be given effect while a case is still on direct review. Significantly, however, the court limited application of this rule to instances involving a conflict between individual and national interests. The hereinabove cited provision from Schooner Peggy makes it clear that in disputes between private individuals, the courts will strive against an application which, by retrospective operation, will affect existing rights.
The general rule announced in Linkletter concerning retroactive application of changes in criminal laws to cases on direct review also appears inconsistent with the authorities cited as precedent therefor. In this regard we note that James, above, which involved a violation of federal law and was cited in Linkletter, failed to apply a change in criminal law to a case on direct review. In James, the Court declined to apply the Rutkin rule to the petitioner when the matter was heard on certiorari.
Considerable importance is attached to the fact that the Chicot County and Gelpcke cases, above, (both cited in Linkletter) each attempted an enumeration of the salient factors deemed decisive of the issue of the effect to be accorded changes in the law in civil cases. In Gelpcke, considerable stress was laid upon the inviolability of contracts. In Chicot County, it was stated:
"The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of *338 public policy in the light of the nature of both of the statute and of its previous application, demand examination."
In our judgment, to literally and blindly follow Linkletter's suggestion that all civil cases on direct review should be determined in the light of changes in the law occuring while such cases are on direct review, requires deliberate disregard of the dictates in Gelpcke and Chicot County, above. We see no logical reason for ignoring and disregarding such vital factors as status, reliance, the inviolability of contracts and the vested rights principle, merely because a civil case is on direct review, and at the same time apply these basic, fundamental principles to a finally adjudicated case. Consequently, we find no merit in appellant's suggestion that Levy, above, is applicable herein merely because the instant matter is on direct review before this Court.
Determination of the effect of Levy on the case at hand must be made in consideration of the salient factors governing the retroactive effect to be given a change of law in civil cases. The Supreme Court has established that these factors include but are not limited to: (1) Reasonable reliance on prior jurisprudence, England, above; (2) bargaining of the parties on the basis of a pre-existing law, Sunburst Oil, above; (3) the inviolability of contracts, Gelpcke, above; (4) relation, individual and corporate, particular conduct, private and public, and status and public policy considered in the light of application of a pre-existing statute, Chicot County, above, and (5) the reluctance of the Courts to retroactively apply a change in civil law to a case which affects the rights of the parties, Schooner Peggy, above. The Supreme Court has often utilized the maxim that vested rights should not be retroactively divested by a change of law. See 50 Am. Jur. Statutes, Sec. 475, page 492, and cases therein cited. The term "vested right" is not an analytical device. Rather, it is a conclusion or determination that a particular status, condition or position merits preservation and protection for policy considerations. In this respect a vested right is somewhat akin to the nebulous concept "proximate cause". It appears that reference to the phrase "vested rights" in general terms by the United States Supreme Court in cases of the character before us has produced doubt and confusion as to the precise grounds on which the decisions rest. So far as we observe, no clearly definable guidelines have been provided by which the bench and bar may reliably or accurately determine the circumstances under which a right, status or condition will be protected under the concept of "vested rights." The dilemma in this regard seems accentuated by the following pronouncement appearing in Linkletter:
"However, we believe that the Constitution neither prohibits nor requires retrospective effect. As Justice Cardoza said, `We think the Federal Constitution has no voice upon the subject.'"
It also appears an attempt to resolve the quandary, insofar as criminal cases are concerned, was made in Halliday v. United States, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed. 2d 16 (May 5, 1969). Halliday, above, sets forth policy factors to serve as analytical tools by which courts may determine the retroactive or prospective effect to be given changes of law in the criminal field. The question in Halliday v. United States, above, was whether McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed. 2d 418 (1969), which held that when a guilty plea is accepted in violation of Rule 11 the defendant must be afforded an opportunity to plead anew, should be applied to guilty pleas accepted prior to the date of that decision. In answering the question in the negative, the Supreme Court set out the following criteria with regard to retroactivity:
"In deciding whether to apply newly adopted constitutional rulings retroactively, we have considered three criteria: (1) the purpose of the new rule; (2) the extent of reliance upon the old rule; and *339 (3) the effect retroactive application would have upon the administration of justice. E. g., Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed. 2d 248 (1969); Stovall v. Denno, 388 U. S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966)."
The underlying principle of Halliday, above, is that there should and must be rules for guidance, or a set of analytical devices upon which the determination of retroactive or prospective application of changes in the field of criminal law will rest. We believe this basic, fundamental principle equally pertinent in the civil law area to the end that predictability of result in a particular instance may be made with some degree of assurance.
Retroactivity of judicial decisions in civil cases was considered by the Illinois and Arkansas Supreme Courts in Molitor v. Kaneland Community Unit District, 18 Ill. 2d 11, 163 N.E.2d 89, 86 A.L.R.2d 469, and Hare v. General Contract Purchase Corp., 220 Ark. 601, 249 S.W.2d 973, respectively. In Molitor, above, the Illinois tribunal was faced with the question of whether to make retroactive its ruling that school districts no longer enjoyed sovereign immunity against actions in tort. The court was obviously impressed with the hardship that would result from retroactive application of its decree inasmuch as defendant, relying on prior decisions conferring immunity in such cases, either had failed to secure insurance or was inadequately insured. For these reasons the Court declined to make its decree generally retroactive. Nevertheless, the Court made its judgment effective in retrospect as to the school district then before the Court. The result was justified on two grounds: (1) that the announcement of the new non-immunity rule would be mere dicta if not given effect in the case at hand, and (2) failure to make the rule retroactive would deprive plaintiff of any benefit from the effort expended and expense incurred in setting aside the former jurisprudence. We note, however, that in the England and Sunburst Oil cases, above, the United States Supreme Court did not consider the factors relied upon by the Illinois court in Molitor, above, as impediments to making a decision wholly prospective. The same result was reached by the Arkansas Supreme Court in Hare, above. The court in Hare found a sales contract invalid for usury. Nevertheless, upon finding the parties had relied on prior jurisprudence in confecting the transaction, the court in Hare declined to apply its ruling to the case before it.
An article entitled Time and Change in Judge-Made Law; Prospective Overruling, by Thomas S. Currier, appearing in 51 Va. L.R. 201, is cited in a footnote in Linkletter. The very scholarly treatise categorizes the circumstances under which the Supreme Court of the United States has declined retroactive application of a jurisprudential rule change. In this regard, we note the following at page 234, 51 Va.L.R.:
"When overruling decisions have been denied retroactive effect, it has almost always been for either or both of the following reasons: (1) to protect persons who have ordered their affairs in reliance upon what they contemporaneously perceived to be the law; (2) to protect stability in an area where society has recognized stability to be of particular importance. Of these two reasons, the first is a recognition of the value of certainty in law; it protects the individual's right to rely on existing law in managing his affairs. The second is a recognition of the value of stability in the operation of certain social institutions."
The Currier article, above, sets forth five criteria which, in the author's opinion, the Courts have employed either individually or collectively to determine the effect of legislative or judicial changes in the law. These standards are (1) stability, (2) protection *340 of reliance, (3) efficiency of administration of justice, (4) equality, and (5) image of justice. Regarding the Court's application of some or all of the stated principles to individual civil law instances, Mr. Currier notes the following:
"Prospective limitation has generally recommended itself to the courts in situations where the values of stability or reliance or both of them have been dominant and those of equality and the image of justice either not seriously impaired or relatively less important. Generally, the value of judicial efficiency has been only indifferently affected by prospective limitation; it has assumed importance only in res judicata and habeas corpus cases.
* * * * * *
"It is essentially this analysis, or perceived bits and pieces of it, that has led courts to limit overruling decisions to prospective effect in cases involving title to property, questions of personal status involving the family, and commercial transactions precisely because it is usual for persons entering into transactions in these areas consciously to rely on, or at least act in cognizance of, current law."
We conclude, therefore, that the question of retroactive or prospective application of civil law changes must be determined in the light of (1) extent of reliance on previous legislation or judicial decisions, (2) the reasonableness of such reliance, (3) the degree of hardship resulting from a retroactive application of the change, (4) the public interest in the stability of the social institutions involved, if any, and (5) the purpose and intent of both the new and old rule.
Applying these principles to the case at hand, we note that decedent left four legitimate children. LSA-R.S. 23:1232(6) and (8) provide that if there are three or more children surviving, they divide among them the maximum benefits payable under our compensation law. The legitimate offspring, therefore, consumed all benefits payable, leaving nothing for the illegitimates.
LSA-R.S. 23:1101 provides that where the employer is obligated for benefits occasioned by the negligent conduct of a third party, he may pursue the third party in tort to recover the sum thereof. The obvious intent of the statute is to protect the innocent employer from economic loss occasioned by the tortious action of a third party.
In the case at hand, the legitimate issue brought suit against the employer's insurer. The illegitimates joined as parties plaintiff. The legitimates then compromised with the tort feasor thus absolving the employer's insurer from any further liability under our state law. Dismissal of the action brought by the illegitimates was then ordered by the trial court. Appellants chose to appeal dismissal of their action against defendant rather than pursue the alleged third party tort feasor. Should defendant insurer be adjudged liable to appellants for compensation benefits, it could no longer, under the circumstances, recover over against the tort feasor because suit against the third party tort feasor is presently barred by prescription.
When the legitimate issue compromised with the reputed tort feasor, defendant employer and insurer were rendered immune from suit by plaintiffs herein. It is a justifiable assumption that defendants, not suspecting their exposure or liability would be expanded, relied on this immunity by failing to reserve any rights against the tort feasor. We believe this is precisely the type of reliance noted in Molitor, above. Should defendants' former immunity be rescinded by retroactive application of Levy v. Louisiana, above, defendants' liability would be extended to two-sixths of the maximum death benefits payable under state compensation laws. This could amount to a considerable economic factor.
*341 Under the circumstances we cannot conclude defendants were unreasonable in relying on a well established rule which clothed them with immunity from the claim presently urged. The statute in question, LSA-R.S. 23:1101, is designed to afford an innocent employer recourse for economic loss occasioned by the wrongful act of a third party. In Levy, the rule announced was applied in favor of the plaintiffs before the Court on the ground that a claim for damages should not be precluded and the wrongdoer exonerated of liability merely because of plaintiffs' illegitimacy. Implicit in Levy was the principle that denial of retroactive effect to a case on direct review would permit a wrongdoer to go unpunished. Present defendant has done no wrong. Rather, defendant herein has innocently relied on existing statutory provisions and jurisprudence to protect a fixed status and position.
We reiterate our former holding that it is unnecessary to this decision that we determine whether Levy v. Louisiana is to be applied prospectively to increase the rights of illegitimates under our state compensation law.
Rehearing denied.