437 F.Supp. 354 (1977)
UNITED STATES of America, Plaintiff,
v.
STATE OF MONTANA, Department of Revenue of the State of Montana, and W. A. Groff, as Director of Revenue of and for the State of Montana, and his successors in office, Defendants.
Civ. A. No. 1989.
United States District Court, D. Montana, Helena Division.
August 19, 1977.
*355 John J. McCarthy, Chief Gen. Litigation Section, Tax Division, U. S. Dept. of Justice, Washington, D. C., Charles E. Stratton, Trial Atty.  Tax Division, U. S. Dept. of Justice, Washington, D. C., Thomas A. Olson, U. S. Atty., Billings, Mont., for plaintiff.
Terry B. Cosgrove, Sp. Asst. Atty. Gen., Helena, Mont., Robert A. Poore, Sp. Asst. Atty. Gen., Butte, Mont., for defendants.
Before KILKENNY, Circuit Judge, and EAST and SMITH, District Judges.[*]

DECISION
EAST, Senior District Judge:

The Action:
The United States of America, by and through an appropriate delegate of the Department of the Army, (Government) filed this action in April, 1971 against the State of Montana and the above named officials of that state (State). During the proceedings, *356 the three-judge District composed of Judges Browning, East and Smith postponed the proceedings during the pendency of a state court action culminating in the decision of the Supreme Court of the State in Peter Kiewit Sons' Co. v. State Board of Equalization, 161 Mont. 140, 505 P.2d 102 (1973), (Kiewit).
A final pretrial order was filed by the parties wherein the Government challenges the validity of the State's public contractors' licensing and Gross Receipts Tax (G. R. Tax) Act, Chapter 35, Title 84, Revised Code of Montana 1947, as amended, (the Act)[1] and regulations promulgated thereunder under Article VI, Clause 2, (Supremacy Clause) and the Fourteenth Amendment (Equal Protection Clause) to the United States Constitution, and seeks:
(a) Declaratory and injunctive relief against the enforcement of the Act against it, its contractors, subcontractors, and others with whom it deals (Contractors); and
(b) A refund of unlawful taxes paid by the Government through its Contractors.
Following oral argument before this three-judge District Court, the matter was submitted upon the merits based upon the evidentiary record made before the Honorable Russell E. Smith and the records and files herein.

Jurisdiction:
We note jurisdiction under 28 U.S.C. §§ 1345 and 2201.

The Act:
The Act provides:
(a) The definition of a public contractor is anyone who proposes and does perform work for the government, state, its county or municipal governments, and school districts, and is required to meet standards or grounds to determine fitness and responsibility in order to: (1) submit bids or proposals, (2) enter into contracts with the government, and (3) perform or continue his contractual obligations with the government, and is subject to suspension of the contractor's license upon stated conditions. (R.C.M.1947 § 84-3501(b)).[2]
(b) It is unlawful for a public contractor to act in his capacity within the state without having a public contractor's license[3] and paying the G. R. Tax of one percentum of the value of the contractor's prime contract. (R.C.M. 1947 §§ 84-3505(5) and 84-3516.
(c) Methods for a public contractor to obtain a refund from and to the extent of the G. R. Tax, the amount of ad valorem personal property taxes ultimately assessed and paid to the appropriate local taxing authorities of the state, and income and corporate income taxes ultimately determined to be due and paid to the state. (R.C.M.1947 § 84-3514).
(d) For a preferred classification of a private contractors who perform construction contracts for private persons, partnerships, joint ventures, private corporations (including those listed on the New York and American Stock Exchanges) or other non-governmental groups (private contracts) through an exemption to obtain a public contractor's license or pay the G. R. Tax.

*357 Contentions of the Parties:
The Government contends that:
1. The licensing and G. R. Tax provisions of the Act and regulations thereunder are erroneous, invalid, and without legal force or effect because both the language and the operation of the Act violate the Constitution and laws of the United States in that they:
(a) Illegally discriminate against the Government, and its agencies and instrumentalities, and those with whom the Government does business.
(b) Illegally force the Government to pay more for its construction than does a private person, business, or corporation.
(c) Illegally discriminate against those with whom the Government does business.
(d) Illegally provide a system of refunds and credits that discriminate against an out-of-state contractor in favor of a Montana contractor and place a heavier tax burden on such out-of-state contractor.
(e) (The system of refunds and credits) illegally interferes with the Government's free choice to choose its contractors and frustrates the policy of choosing the lowest bidder (in violation of federal procurement law).
2. The G. R. Tax was intended by the State's legislature as a "wash-out" revenue-enforcing measure and, accordingly, each year after all refunds and credits are taken by a Contractor or at the termination of each contract, the State must refund any excess G. R. Tax collected under the Act. Hence, the Government is entitled to a refund of taxes and license fees, with interest, equal to all such amounts or sums as have been paid to the State by the Government or its Contractors under the Act in excess of all refunds and credits taken.
The State contends that:
1. The G. R. Tax, which has worked out by virtue of credits and refunds to be actually a tax of one-half of one percent, is not a direct tax upon the Government so any economic impact upon the Government therefrom is indirect and not substantial.
2. The G. R. Tax is imposed equally and identically upon all public contractors, such that the State, and its subdivisions, are treated exactly the same as the Government.
3. The Act in no sense (either through refunds and credits or otherwise) discriminates against in-state and out-of-state Contractors.
4. The Government, as acknowledged in the pretrial order (item 12-(g), page 7), was the real party in interest in Kiewit. Therefore, under the doctrine of England v. Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), (England) and Drummond v. United States, 324 U.S. 316, 65 S.Ct. 659, 89 L.Ed. 969 (1945), (Drummond), the Government elected to litigate its challenges to the constitutionality of the Act fully in the State Courts of Montana in Kiewit and is barred from relitigating the same again.
5. Further, the Government is collaterally estopped from relitigating the following issues which it caused to be raised and decided:
(a) The reasonableness and validity of the classification for the tax purposes between public contracts and private contracts;
(b) The inapplicability of the Act as to the Government's selection or control of its Contractors; and
(c) That the tax is not directly on the Government and that any indirect economic impact is not substantial within the concepts of James v. Dravo Contracting Co., 302 U.S. 134 [58 S.Ct. 208, 82 L.Ed. 155] (1937).

Facts:
We find from the pretrial order agreed facts and evidence of record the following:
1. The Government, prior to and since enactment of the Act, has and will continue to contract with Contractors to perform construction work within the State to erect, build, excavate, alter or repair buildings, *358 structures, installations or facilities for itself, its agencies and instrumentalities, including its Department of the Army.
2. Contractors performing construction contracts in the State are subject to the following three taxes:
(a) Personal property taxes payable to appropriate counties.
(b) Corporation license taxes, or income taxes based on net income, payable to the State.
(c) One percent G. R. Tax applicable to contract proceeds under construction contracts awarded by the Government.
3. Private contractors performing construction contracts in the State for private parties; i. e., for parties other than the Government, the State or political subdivisions thereof; are subject to the following two State taxes:
(a) Personal property taxes payable to counties in the State.
(b) Corporation license taxes, or income taxes, based on net income, payable to the State.
4. Prior to 1971, the Government contractually required its Contractors within the State not to take advantage of the refund provisions and credits provided for in the Act. Such a requirement was contained in the contracts involved in Kiewit. However, since 1971 the Government's contracts, as those involved here, required the Contractors to take advantage of all refunds and credits provided for in the Act and to reimburse the Government in the amount of them. The inescapable effect of the G. R. Tax is to increase the cost to the Contractors for doing business with the Government within the State. Some Contractors add the tax as a line item in their bids. It is inevitable that the increased cost will be passed on to the Government. The State's tax records show that after deducting all credits allowable on account of the payment by Contractors for ultimately assessed personal property and income taxes and corporate license fees, the State retains in its general fund approximately one-half of the G. R. Tax. This overplus or non-washout is an average figure because the tax credits which may be taken vary between Contractors. One Contractor may use more valuable personal property than another and one Contractor may be liable for either state corporate license fees or income taxes while another is not. As the credits which may be taken vary, the amounts of the Contractors' G. R. Tax actually retained by the State also vary. For example, an average Contractor performing a $5,000,000 contract for the Government would, after credits, pay an overplus of G. R. Tax of slightly less than one-half of one percent, or $25,000. That amount constitutes general revenue to the State,[4] a substantial part of which amount has been paid by the Government.
5. Subordinate public entities of the State experience the same adverse tax effect under their public contracts; however, the State does not because of its retention as general revenue of approximately one-half of the G. R. Tax paid.
6. The net amount of the G. R. Tax, after allowing all tax credits, paid by instate based public contractors and retained in the general fund of the State is .44 of the G. R. Tax, and the net amount of the G. R. Tax paid by out-of-state public contractors and retained in the general fund of the State is .46 thereof.

Discussion and Conclusions:

State's Contention 5:
We meet a threshold disposition of the State's contention 5 raising the issue of a foreclosure of the Government's contentions under the doctrine of res judicata and judicial estoppel in view of the decision in Kiewit.
This issue was first raised herein immediately following the decision in Kiewit through the State's motion for a summary *359 judgment under the rationale of England and Drummond. The motion was denied under the reasoning of this Court's decision entered on the 20th day of November, 1974. That decision reserved for later decision as to whether the holdings in Kiewit were dispositive of any of the ultimate pretrial order Government issues of unequal treatment. We will later herein meet that challenge. The decision also concluded that Government's asserted issue that the Act's provisions as applied to it violated the Supremacy Clause "remain[s] viable and unfettered by any holding in Kiewit." We now reach that same conclusion.

Government's Contention 1(a) and (c):
We deem these two contentions to be one and the same.
It is manifest from the above findings of fact that as between the State and the Government, the imposition of the G. R. Tax upon Contractors discriminates against the Government and in favor of the State. Although a public contractor for the State might add the G. R. Tax as a line item in his bid and thus increase the cost of construction, the State would receive as general revenue that portion of the G. R. Tax remaining after allowing credits and refunds. As indicated, that averages slightly less than 50 percent of the G. R. Tax. Contra, the Government is required to pay through increased bids by the imposition of the G. R. Tax and gets no return of the overplus of approximately 50 percent.[5]
Homestake-Sapin Partners v. United States, 375 F.2d 507, at 512 (10th Cir. 1967), teaches:
"Whether a tax discriminatory against the United States is unconstitutional under the Fourteenth Amendment, the supremacy clause, or both, is a question the Supreme Court has not had occasion to answer. See discussion in Comptroller of Treasury, Retail Sales Tax Div. v. Pittsburgh-Des Moines Steel Co., 231 Md. 132, 189 A.2d 107. Chief Justice Warren in Phillips Chemical Co. v. Dumas School District, 361 U.S. 376, 385, 80 S.Ct. 474, 480, 4 L.Ed.2d 384, involving discriminatory taxes levied against lessees of government property, intimates that unconstitutionality in discrimination cases stems from the supremacy clause when he says, `. . . we have made it clear, in the equal protection cases, that our decisions in that field are not necessarily controlling where problems of intergovernmental tax immunity are involved. . . . Accordingly, it does not seem too much to require that the State treat those who deal with the Government as well as it treats those with whom it deals itself.'"
Compare Esso Standard Oil Co. v. Evans, 345 U.S. 495, 500, 73 S.Ct. 800, 97 L.Ed. 1174 (1953). See also United States v. City of Detroit, 355 U.S. 466, 473, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958); and Alabama v. King and Boozer, 314 U.S. 1, 8, 62 S.Ct. 43, 86 L.Ed. 3 (1941).
We conclude and declare that the imposition of the G. R. Tax under the Act upon the Contractors subjects the Government to discrimination in favor of the State, all in violation of the Supremacy Clause. We further conclude that the Government is entitled to permanent injunctive restraint of future imposition of the G. R. Tax upon its Contractors in order to alleviate the discriminatory effect of the Act as applied to it.

Government's Contention 1(b):
In view of our holding that the Act violates the Supremacy Clause, we find it unnecessary to pass upon the Equal Protection Clause issues or upon the questions of collateral estoppel arising as to them.
However, nothing in the issues raised presented, nor did the contractor Kiewit *360 have standing to raise on behalf of the Government in Kiewit, the Government's current issue of the discriminatory effect upon it as an owner-builder by the imposition of the G. R. Tax upon its Contractors in violation of the Supremacy Clause. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948).
The decision in Kiewit finds a reasonable classification of public contractors, vis-a-vis, private contractors, for different tax purpose[6] treatment under the Act in a recital of some four factors, namely:
(1) A public work is intended for the use of the public, and if the work is inadequate in some particular way, this could expose and would expose some part of the public at large to danger, inconvenience, or injustice. That of course would not always be true in the case of a private contractor.
(2) Public contractors must be experienced, they must establish their qualifications to the state or federal government. However, private property owners could engage a licensed or unlicensed contractor or an experienced or inexperienced one.
(3) Public contractors invariably must provide a bond. Private works require bonds only at the election of the owner.
(4) Public works normally would involve elaborate, professionally drawn plans and specifications. They would also include mandatory supervision or inspection. Private works would have such inspection and/or supervision at the option of the owner.
It must be assumed for validity of such rationalization that those factors or reasons are subjects of and enforceable under state law; otherwise they are mere suppositions. Yet by reason of State's judicial decree and administrative action, none of the Act's requirements for the fitness, financial responsibility or supervision applies to Contractors.
It is manifest to us that as between Contractors and large structure private contractors,[7] there is no reasonable or rational factual basis for the demonstrated unequal treatment under the Act.
"The rule to be derived from the Court's more recent decisions, then, is that the economic burden on a federal function of a state tax imposed on those who deal with the Federal Government does not render the tax unconstitutional so long as the tax is imposed equally on the other similarly situated constituents of the State." United States v. County of Fresno, 429 U.S. 452, at 462, 97 S.Ct. 699, at 704, 50 L.Ed.2d 683 (1977).
"If anything is settled in the law, it is that a State may not discriminate against the Federal Government or its [Contractors]. See, e. g., Phillips Co. v. Dumas School District, [supra]; United States v. City of Detroit, [supra]; City of Detroit v. Murray Corp., 355 U.S. 489, [78 S.Ct. 458, 2 L.Ed.2d 441.]" Moses Lake Homes, Inc. v. Grant County, 365 U.S. 744, at 751, 81 S.Ct. 870, at 874, 6 L.Ed.2d 66 (1961).
*361 We conclude and declare that the imposition of the G. R. Tax upon Contractors discriminates against the Government in favor of private contractors, all in violation of the Supremacy Clause. We further conclude that the Government is entitled to permanent injunctive restraint against the State's future imposition of the G. R. Tax upon Contractors.

Government's Contention 1(d):
The facts disclose that the system of refunds and credits applicable to the G. R. Tax under the Act discriminates against out-of-state public contractors in favor of in-state public contractors to the extent of .02 of one percent, or two cents on each $100 of a bid amount.
We conclude that that amount in a dollar and cents discriminatory effect is de minimis and the contention is without merit.

Government's Contention 1(e):
While the facts reveal that the existence of the Act with its imposition of the G. R. Tax upon Government Contractors tends to chill the field of federally qualified contract bidders, yet there is no substantial evidence in the record that the Government has been materially frustrated in its procurement law policy or mandate of choosing the lowest bidder on any specific project.
We conclude the issue is without merit.

Government's Contention 2:
We deem it expedient and in conservation of judicial time and effort that this issue of the Government's recovery of the overplus of the G. R. Tax paid to the State in excess of all allowable refunds and credits be remanded to the single judge District Court for disposition under further order by the Honorable Russell E. Smith, Chief Judge for the District.
The injunctive restraint of general fund disposition by the State of such overplus of G. R. Tax held by the State is to remain in force and effect until further order of the single judge District Court.
Neither party shall recover costs in these three-judge District Court proceedings.
This decision shall constitute the findings of fact and conclusions of law of this three-judge District Court as provided by Fed.R. Civ.P. 52(a).
Counsel for the Government is requested to serve and submit within 25 days from the date hereof a proposed declaratory judgment and decree of permanent restraint in accordance with the foregoing decision.
DATED this 19th day of August, 1977.
KILKENNY, Circuit Judge, dissenting:
I dissent. For ease of reference, I prefer to state my own version of the relevant facts.

BACKGROUND
The Montana Act levies a 1% tax upon the gross receipts of "public contractors," defined to include all persons who perform contracts for the State of Montana, its subdivisions, and the United States Government [the federal government]. The Act contains provision for refunds and credits: contractors who produce proof of payment of personal property taxes receive a pro-rata refund of taxes paid; the balance of the tax may be claimed as a credit against Montana personal income and corporate taxes.
In its 1971 action, the federal government sought both a declaratory judgment as to the constitutionality of the Act and an injunction prohibiting the collection of the tax and ordering a refund of the taxes previously collected. In May of 1971, this court, pursuant to a stipulation of the parties granted a continuance until such time as the Montana courts could consider the Act. The Montana Supreme Court considered the Act on two occasions and ruled against the federal government both times.
In the first, Peter Kiewit Sons' Co. v. State Board of Equalization, 161 Mont. 140, 505 P.2d 102 (1973) [Kiewit # 1], the federal government concedes that it was the real party in interest. Relevant to the present inquiry, Kiewit # 1 resolved the following issues:

*362 (1) It held that the Act did not have the effect of imposing a tax directly upon the federal government.
(2) It held that the statutory classification between public and private contractors was rational and constitutional such that there could be no discrimination against either the federal government or the public contractors.
(3) It held that there was no discrimination against the federal government because the Act complied with equal force to all public contractors.
In Peter Kiewit Sons' Co. v. Department of Revenue, 166 Mont. 260, 531 P.2d 1327 (1975) [Kiewit # 2], the Montana Supreme Court reaffirmed its earlier decision and held that Kiewit # 1 was res judicata. It also held that a reasonable classification for tax purposes lay between public and private contractors and that the Act was a legitimate revenue raising device.
After the decision in Kiewit # 1, both parties moved for summary judgment in this court. The state, in arguing that the case should be dismissed under the authority of, inter alia, England v. Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), claimed that the federal government tried its case in the state courts and left no issues for decision by the federal court. This court, however, specifically declined to rule on these res judicata and collateral estoppel issues on the ground that at least "... some of the [federal] Government's presently asserted issues of violation of the Supremacy Clause remain viable and unfettered by any holding in Kiewit [# 1]...." [Filed November 20, 1974].
Before us, the federal government advances the same arguments it made in the state courts, and continues to maintain that the Act discriminates against it. The state takes the opposite position and, in addition, claims that the federal government is precluded from relitigating these issues on either res judicata or collateral estoppel principles.

PRELIMINARY CONSIDERATION
At various places throughout the majority opinion, see, e. g., footnotes 1, 4, and 6, the majority intimates that its decision is based at least in part upon a view of the legislative history of the Act and the treatment given it by the Montana Supreme Court [in Kiewit # 1]. The majority indicates that the Act has resulted in the raising of revenue, "all in the face of legislative and judicial disavowal of intent to do so." This is wrong and totally overlooks what the Montana Supreme Court said in Kiewit # 2. Kiewit made the same argument there: it argued that the Act was constitutional only insofar as it created a fund from which the state could secure the payment of income taxes and personal property taxes; any amount remaining after such payment, the argument goes, had to be refunded to the individual contractor. The Montana Supreme Court expressly rejected this argument:
"Kiewit insists that the only basis for this Court's conclusion that the Act was not discriminatory as to the public contractors was that if the Act were properly enforced, it would result in a `washout'; that is, refunds of personal property taxes and contractors' income taxes would offset the 1% gross receipts tax. Kiewit reads our opinion much too narrowly. We held there that a reasonable classification for tax purposes lay between private and public contractors." [Emphasis supplied]. 531 P.2d at 1328-9.
Clearly, the Supreme Court of the State of Montana held that the Act was a legitimate revenue raising device. We are faced, therefore, with only two general issues, the res judicata/collateral estoppel one, and the issue involving the propriety of the tax under the Supremacy Clause.

RES JUDICATA AND COLLATERAL ESTOPPEL
Because I disagree with the substantive holdings of the majority, it is unnecessary to even consider its treatment of the above issues. Nevertheless, it is important that I express my firm views on these issues.
*363 At the outset, I must say that I am unable to understand the majority's treatment of this problem. It at no point distinguishes between the doctrines of res judicata and collateral estoppel in its one-paragraph discussion. On the basis of this court's November 20, 1974, decision [denying the summary judgment motions], the majority summarily concludes that "the Supremacy Clause issue" remains. This is a gross misinterpretation of that decision which concluded merely that ". . . at the least, some of the Government's presently asserted issues of violation of the Supremacy Clause remain viable and unfettered by any holdings in Kiewit [ # 1]. . . ." [Emphasis supplied]. The majority does not distinguish between the variety of Supremacy Clause issues that were raised. Nor does it mention the issues that were tried and decided in Kiewit # 1.[1] The majority leaves us in the dark as to the issues it feels remain and why.
For example, it here considers and upholds the propriety of the classification between resident and non-resident contractors even though it felt in 1974 that Kiewit # 1 had disposed of the issue.[2] Similarly, the majority completely avoids the fact that the Supremacy Clause issues [relied upon by it to invalidate the Act] were already decided by the Montana Supreme Court in Kiewit # 1. In short, the majority's failure to indicate whether and to what extent the federal government is bound by the prior litigation has only obscured the nature of the issues to be decided.
England applies where the federal government "freely and without reservation" *364 submits its federal claims for decision to the state courts. The federal government has not shown us when or how it informed the state courts of any intention to return to the federal court. On the record here presented, I can only conclude that the federal government did so submit its claims.
Moreover, in its conclusion that the Act was unconstitutional on the two substantive grounds, the majority did not specifically consider the application of the collateral estoppel doctrine. From its conclusion that these two issues remained open after Kiewit # 1, it says by implication that the doctrine would apply to bar consideration of the issues if they had been presented in the state court. I agree with this implication, and think that the issues were raised.
I conclude that the federal government had the requisite control over the litigation in the state courts.[3] Having such control, it was bound by the outcome. Drummond v. United States, 324 U.S. 316, 65 S.Ct. 659, 89 L.Ed. 969 (1945). See generally Expert Electric, Inc. v. Levine, 554 F.2d 1227 (C.A.2 1977); American Safety Flight Systems v. Garrett Corp., 528 F.2d 288 (C.A.9 1975); Aerojet General Corp. v. Askew, 511 F.2d 710 (C.A.5 1975), cert. denied 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137; Troy Company v. Products Research Co., 339 F.2d 364, 367 (C.A.9 1964); petition for cert. dismissed, 381 U.S. 930, 85 S.Ct. 1762, 14 L.Ed.2d 689 (1965). See also 1B Moore's Federal Practice § 0.411[6]; Restatement of Judgments § 84, Comment (e) (1942). At a minimum, therefore, the federal government is collaterally estopped from relitigating the issues that were tried in state courts. Thus, even if the England rule does not apply, I would conclude that the doctrine of collateral estoppel applies and that it precludes our consideration of the merits of the two substantive issues reached by the majority.

MERITS
Assuming, arguendo, that the merits are properly before us, I would oppose the majority views.
It concludes that the Act discriminates against the federal government and in favor of the state. Its conclusion, I believe, is fundamentally unsound.
The majority reasons that:
"... the State would receive as general revenue that portion of the G. R. Tax remaining after allowing credits and refunds.... Contra, the [federal] Government ... gets no return of the overplus of approximately 50 percent."
Thus, the majority correctly finds that this state tax results in state revenue [that portion of the tax retained after refunds and credits]. It goes on, however, to erroneously find that the existence of this state revenue works a discrimination against the federal government because there is no corresponding revenue to the federal government. This reasoning, if followed to its logical conclusion, would effectively invalidate *365 the state taxes routinely upheld in Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941), and James v. Dravo Contracting, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937).
Dravo, for example, involved a two percent gross receipts tax imposed by the state of West Virginia upon contractors performing work in the state. Dravo Contracting was constructing dams and locks in the area pursuant to a contract with the United States. The Court dismissed the constitutional challenges and upheld the tax despite the economic burden upon the federal government. Likewise, the Court in King & Boozer refused to invalidate a two percent Alabama sales tax which was passed on to the federal government contractors under a "cost-plus" contract with the federal government:
"So far as such a non-discriminatory state tax upon the contractor enters into the cost of the materials to the Government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties. The asserted right of the one to be free of taxation by the other does not spell immunity from paying the added costs, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity." 314 U.S. at 8-9, 62 S.Ct. at 45.
The reasoning of the majority sub silentio overrules this and other authority. In each of the above cases, the tax would apply equally to those doing work for the state government. Applying the reasoning of the majority, there is discrimination against the federal government because the otherwise legitimately collected tax [general state revenue] reduces the state's net cost, thereby allowing it to spend less than the federal government. Thus, under the guise of discrimination against the federal government, any state tax could be traced backwards to defeat its own existence.
Nor can the federal government support its discrimination claim with statistics showing an economic impact upon it. King & Boozer and Dravo upheld taxes with a more severe economic impact than is present here. More recently in United States v. Boyd, 378 U.S. 39, 50-1, 84 S.Ct. 1518, 1525, 12 L.Ed.2d 713 (1964), the Supreme Court expressed its approval of Boozer and its predecessors in clear and precise language as follows:
"The principles laid down in King & Boozer, . . . we think, strike a proper judicial accommodation between the interests of the States' power to tax and the concerns of the Nation, they are workable, and we adhere to them. If they unduly intrude upon the business of the Nation, it is for Congress, in the valid exercise of its powers, not this Court, to make the desirable adjustment." [Emphasis supplied].[4]
*366 The proper test for discrimination is found in Phillips Co. v. Dumas School Dist., 361 U.S. 376, 80 S.Ct. 474, 4 L.Ed.2d 384 (1960), a case cited to us by both parties in support of their positions. Phillips dealt with a tax by the state of Texas on lessees of property from the federal government, which tax did not apply to lessees of property from the state of Texas as lessor. In striking down the state tax as discriminatory against the federal government, the Court laid down a relatively simple test:
". . . it does not seem too much to require that the State treat those who deal with the [federal] Government as well as it treats those with whom it deals itself." Id. at 385, 80 S.Ct. at 480.
The majority erroneously reads this case, and presumably this test, as supportive of its decision. The fact is, however, that all public contractors under the Montana Act, whether working for the state or the federal government, are treated in identical fashion; each of them is subject to the same one percent gross receipts tax. The state of Montana, therefore, does "treat those who deal with the [federal] government as well as it treats those with whom it deals itself." Id. The Montana courts came to this same conclusion and I think that they were correct. See also International Paper Co. v. County of Siskiyou, 515 F.2d 285 (C.A.9 1974).

OTHER CLAIMS
With little more than a scant reference to the Act's "discriminatory effect upon it [the federal government] as an owner-builder . . .," the majority concludes that it is not precluded under the collateral estoppel doctrine from considering the propriety of the classification between public contractors and private contractors. Its collateral estoppel argument is, of course, without merit.[5] Moreover, its reference to a discriminatory effect upon the government is misplaced. This case would have been thrown out of court six years ago if the tax were being placed upon the federal government as a contractor. The fact is that it is not. The federal government complains only about the higher prices it must pay as a result of the tax upon its contractors.[6]
Its conclusion that the Act discriminates against the federal government and in favor of private parties, is meritless.
Because of its earlier holding of unconstitutionality, the majority ". . . find[s] it unnecessary to pass upon the Equal Protection Clause issues or upon the questions of collateral estoppel arising as to them." It, nevertheless, then finds that:
". . . [h]owever, nothing in the issues raised presented, nor did the contractor Kiewit have standing to raise on behalf of the Government in Kiewit, the Government's current issue of the discriminatory effect upon it as an owner-builder by the imposition of the G. R. Tax upon its Contractors in violation of the Supremacy Clause." [Citation omitted].
Because the interests of the federal government are implicated, the majority correctly treats this "equal protection clause" issue as implicating the Supremacy Clause. Kiewit # 1 did the same thing and cited the same Supremacy Clause cases, but it found the Act constitutional on this ground:
"The second half of the discrimination question raised by appellant is that this tax discriminates against the federal government. It urges that the state of Montana is required to treat the United States and other public bodies as well as it treats private nongovernmental parties. Appellant contends granting a preferred tax status to a substantial number of taxpayers, contractors performing work for private owners, and failing to grant a comparable status to construction contractors of the United States, constitutes *367 unconstitutional discrimination against the United States and those with whom it deals."
* * * * * *
"Here, we do not believe that the state of Montana has discriminated against the federal government." 505 P.2d at 109.
It is clear, therefore, that the next couple of pages of the majority disposition contain only dicta [because unnecessary to its finding of unconstitutionality], and bad dicta at that [because the issue was foreclosed on collateral estoppel grounds and because it is wrong on the merits]. Kiewit # 1 held that a valid tax classification lay between public and private contractors and I do not think that the federal government has shown otherwise. I find no evidence in the record to show that the federal government met its burden of proof. Testimony offered by the state of Montana, on the other hand, attests to the real and substantial differences between the two classes of contractors. For equal protection purposes, there is a very liberal standard of review and cases will be upheld if there is any conceivable basis which will support the classification. See, e. g., Allied Stores of Ohio v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959); Brown-Forman Co. v. Kentucky, 217 U.S. 563, 30 S.Ct. 578, 54 L.Ed. 883 (1910). Cf. San Antonio School Dist. v. Rodriguez, 411 U.S. 1, 40-1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Essentially the same test is applied in cases related to intergovernmental tax immunity under the Supremacy Clause. Chief Justice Warren in the Phillips case, however, indicated that the equal protection cases are not controlling, and that the [federal] government's interest must be weighed in the balance to ascertain whether the state treats similarly-situated constituents in a similar fashion. 361 U.S. at 385, 80 S.Ct. 474. As noted above, this condition is satisfied here in that all contractors are subject to the same exact tax. In short, I think that the federal government has failed in its burden of showing the classification improper. In view of the standard of review, I would uphold the classification.
The balance of the federal government's arguments in support of its discrimination claim have been rejected in state court. If they were properly before us, I would find them meritless too.
In particular, the argument that the Act places the legal incidence of the tax upon the federal government is without merit. See 505 P.2d at 110. A much stronger argument on this ground was available in King & Boozer, the situation involving a cost-plus contract where it is clear that the 2% tax was passed on to the federal government, but the Court upheld the state tax. Cases such as United States v. Mississippi Tax Comm'n., 421 U.S. 599, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975); Agricultural Bank v. Tax Comm'n., 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968); and Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954) are clearly distinguishable.

CONCLUSION
Independent of the res judicata and collateral estoppel issues, I reject the majority's conclusion that the Act discriminates against the federal government and in favor of both the state of Montana and private parties within the state. The state has exercised its power to raise revenue in an even-handed fashion by taxing all those similarly situated [public contractors] in the same manner. United States v. County of Fresno, 429 U.S. 452, at 462, 97 S.Ct. 699, at 704, 50 L.Ed.2d 683. (1/25/77). Cf. Kiewit # 2, 531 P.2d at 1329; State ex rel. Schultz Lindsay v. Board of Equalization, 145 Mont. 380, 403 P.2d 635 (1965). The contrary holding of the majority directly undermines all recent authority in this area. Any increased costs to the federal government, so heavily relied upon by the majority, are "but a normal incident of the organization within the same territory of two independent taxing sovereignties. . . ."[7] Additionally, private parties within the state are not illegally favored because the federal *368 government is not in the same class with them.
I would reject all the government's contentions and dismiss its complaint with prejudice.
NOTES
[*] Originally the statutory three-judge District Court hearing the above was comprised, pursuant to the designation of Chief Judge Richard H. Chambers for the Ninth Circuit under date of April 28, 1971, of the Honorable James R. Browning, U. S. Circuit Judge for the Ninth Circuit, William G. East, Senior U. S. District Judge for the District of Oregon, and Russell E. Smith, Chief Judge for the District of Montana. Thereafter pursuant to the designation of the Honorable James R. Browning, Chief Judge for the Ninth Circuit under date of July 13, 1976, the composition of the statutory three-judge District Court herein was redesignated by the designation and appointment of the Honorable John F. Kilkenny, Senior U. S. Circuit Judge for the Ninth Circuit, in lieu of the Honorable James R. Browning, and the redesignation and appointment of the Honorable William G. East and the Honorable Russell E. Smith.
[1] For a concise history and statement of the purposes of the Act, see Kiewit, 505 P.2d at 104-06. In short, the Supreme Court of Montana labels the Act as a legislative "revenue enforcing measure designed to operate hand in hand with [the State's] long-standing personal property tax and income tax, to ensure more effective tax collection and reduce tax avoidance."
[2] It was held by the Supreme Court of Montana in Kiewit that the regulatory provisions of the Act do not apply to the United States, and the parties have stipulated that the regulatory provisions are not in issue here.
[3] The Act provides for fixed fees for A, B, and C licenses ranging in cost from $200 for an A license to $10 for a C license. The holders of B and C licenses are limited as to the value of the public contract which they may undertake. R.C.M.1947 § 84-3505(1) to (4). No issue arises as to those fees.
[4] Since the Act has been in effect, it has produced up to July, 1975, general revenue to the State from Government contracts in the amount of $5,658,437.29, all in the face of legislative and judicial disavowal of intent to do so.
[5] The Supreme Court of Montana in Peter Kiewit Sons' Co. v. Department of Revenue, 166 Mont. 260, 531 P.2d 1327, at 1328 (1975), suggests that a Contractor "would be entitled to a refund or some other administrative remedy" for the overplus of the G. R. Tax retained by the State. However, no statutory or administrative procedure for such relief has been presently called to our attention.
[6] As heretofore pointed out, the Act is not revenue raising or taxing legislation, but on the contrary it is a measure to enforce other revenue and taxing laws. The evidence is conclusive that when the mission of the Act has been accomplished, as in this case, the State has received and kept in its general fund approximately one-half of the G. R. Tax paid by Contractors.
[7] It is common knowledge that throughout the United States, the Government contracts with private owner-builder parties for the construction and leasing of huge structures for governmental use.

There is relevant and substantial evidence in the record that there are no significant differences between a contractor's bid on an identical private project, vis-a-vis, a project to be performed for the Government; i. e., the private construction of large bank buildings and the Big Sky Ranch project or the Government's construction of a post office or courthouse building. The same type of construction problems can be encountered in a private contract as in a public one, and the only essential difference between a federal construction project and an identical construction project performed for a private person, business or corporation is that the ultimate cost is approximately one percent greater to the Government.
[1] As relevant to the present inquiry, this court, in its 1974 decision, listed the following issues as among those considered in Kiewit # 1:

"(1) The 1% gross receipt tax did not entirely `wash out' [the gross receipt tax collected aggregated more than the contractor's corporate income and personal property taxes which became payable to Montana and its subdivisions] upon the part of some non-resident contractors and tended to impose a higher overall tax liability to Montana upon those contractors than upon resident contractors. The Supreme Court concluded that this increased liability was due to those contractors' own action or fault and not to any discriminatory effect through the workings of the Act, and in any event, the effect of the non-washout of the receipts tax collections was of minor consequence and not of unconstitutional status.
"(2) As stated by the Supreme Court, `[Kiewit's] primary argument' was that the 1% gross receipt tax is placed upon public construction contractors and not private construction contractors and is discriminatory and lacks equal treatment under the law. The Supreme Court reasoned and held, under Montana decisions based upon federal law, that the several classifications between `public' and `private' among contractors were rational, reasonable, and constitutional.
"In addition, the Supreme Court did deal with two issues of alleged discrimination against the Government, namely and as stated by that court:
"(a) The second half of the discrimination question raised by [Kiewit] is that this tax discriminates against the federal government. It urges that the state of Montana is required to treat the United States and other public bodies as well as it treats private nongovernmental parties. That argument was rejected through the rationale that the Government suffered no discrimination since the Act applied with equal force to Montana and its subdivisions in their public contracts. Nevertheless we point out that such a conclusion does not absolve the manifest adverse effect of the operation of the Act and regulations upon the non-resident prospective or firm public contractors and the favoritism allowed resident prospective or firm public contractors who hold a higher potential base of tax liability to Montana, thereby narrowing the field of public contractors open to the Government.
"`(b) Finally, it [was] argued that this Act violates the immunity of the federal government from taxation or the economic impact of taxation.' This argument was rejected under federal law."
[2] I find no indication in Kiewit # 1 that this issue was in fact decided by the Montana Supreme Court such that we could not consider it. In its 1974 decision, however, see footnote 1, this court felt otherwise. Were I to reach the merits of this issue, in any event, I would be in complete agreement with the substantive holding of the majority that any discrimination is de minimus.

The happenstance difference in treatment referred to in the majority opinion [.44% v. .46%] does not approach constitutional dimension even though there is favoritism to the extent that resident contractors are presumed to have a higher potential base of tax liability in the state of Montana. Each contractor, in any event, receives identical tax treatment under the Act. The Act itself makes no distinction.
[3] To support its position that the federal government was bound by the decisions in the prior litigation, the State refers us to the admitted facts regarding the extent of the federal government's participation in Kiewit # 1:

(1) The federal government required that the lawsuit be filed by Peter Kiewit.
(2) The federal government reviewed and approved the complaint.
(3) The federal government paid the attorneys fees and costs involved in the action.
(4) The federal government directed the appeal from the state district court to the Montana Supreme Court.
(5) Before the Montana Supreme Court, the federal government appeared as amicus curiae, submitted a brief and participated in oral argument.
(6) The federal government was the real party in interest in the state court litigation.
(7) The federal government directed the filing of a notice of appeal to the United States Supreme Court.
(8) The federal government, through the Solicitor General, effectuated Kiewit's abandonment of its appeal to the United States Supreme Court.
The federal government maintains, inter alia, that the above facts demonstrate an insufficient amount of participation to say that it had a "laboring oar" in the state court controversy. Drummond v. United States, 324 U.S. 316, 65 S.Ct. 659, 89 L.Ed. 969 (1945). I disagree.
[4] This same thought has been echoed by the Supreme Court on a number of other occasions. As long ago as 1943, Penn Dairies v. Milk Control Comm'n., 318 U.S. 261, 270-1, 63 S.Ct. 617, 621, 87 L.Ed. 748, the Court stated:

"The trend of our decisions is not to extend governmental immunity from state taxation and regulation beyond the national government itself and governmental functions performed by its officers and agents. We have recognized that the Constitution presupposes the continued existence of the states functioning in coordination with the national government, with authority in the states to lay taxes and to regulate their internal affairs and policy, and that state regulation like state taxation inevitably imposes some burdens on the national government of the same kind as those imposed on citizens of the United States within the state's borders, [citation]. And we have held that those burdens, save as Congress may act to remove them, are to be regarded as the normal incidents of the operation within the same territory of a dual system of government, and that no immunity of the national government from such burdens is to be implied from the Constitution which established the system, [citation]." [Emphasis supplied].
See also United States v. City of Detroit, 355 U.S. 466, 474, 78 S.Ct. 474, 479, 2 L.Ed.2d 424 (1958):
"Today the United States does business with a vast number of private parties. In this Court the trend has been to reject immunizing these private parties from nondiscriminatory state taxes as a matter of constitutional law. [Citation]. Of course this is not to say that Congress, acting within the proper scope of its power, cannot confer immunity by statute where it does not exist constitutionally. Wise and flexible adjustment of intergovernmental tax immunity calls for political and economic considerations of the greatest difficulty and delicacy. Such complex problems are ones which Congress is best qualified to resolve." [Emphasis supplied].
[5] Kiewit # 1 decided this precise issue adverse to the contention of the federal government. See footnote 1, supra.
[6] This claim must be rejected. See text accompanying footnote 4.
[7] See King & Boozer, supra, 314 U.S. at 9, 62 S.Ct. at 45.